**In re MICROSTRATEGY INC. SECURITIES LITIGATION**

No. CIV.00-473-A.

United States District Court, E.D. Virginia, Alexandria Division.

Aug. 18, 2000.

---

Craig Crandall Reilly, Richards, McGettigan, Reilly & West, P.C., Alexandria, VA, for Plaintiffs.

Leo Stephen Fisher, Bean, Kinney & Korman, P.C., Arlington, VA, Edward John Bennett, Esquire, William & Connolly, Washington, DC, for Defendants.

## MEMORANDUM OPINION

ELLIS, District Judge.

Following defendant MicroStrategy Inc.'s announcement on March 20, 2000, that it had significantly overstated its revenue for the years 1998 and 1999, approximately two dozen class action securities fraud actions were filed in this district

against MicroStrategy and other defendants. Threshold motions in various of those actions led to the consolidation of the actions and the designation of lead plaintiffs and lead counsel, all pursuant to the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4(a)(3). This memorandum records the facts and reasons for the consolidation and the naming of lead plaintiffs and lead counsel.

## I

This action is comprised of over two-dozen now-consolidated class action securities fraud suits,[1] each of which is based on allegations that the defendants, including MicroStrategy, its auditor, PricewaterhouseCoopers, and various individual defendants, knowingly or recklessly made various material false statements, misrepresentations, and omissions about the success of MicroStrategy Inc., and in so doing, violated § 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 of the Securities and Exchange Commission's ("SEC") regulations. Each com-

plaint alleges essentially the same facts, namely that defendants knowingly or recklessly adopted improper accounting procedures, misreported certain transactions, and otherwise falsely and grossly overstated defendant MicroStrategy's revenues. In doing so, according to the complaint, defendants artificially inflated the stock price. Thus, when MicroStrategy announced, on March 20, 2000, that it had in fact misreported corporate revenue, the stock's value plummeted. Indeed, the closing price of the stock on March 17 was $234 per share, while the closing price on March 20, the day of the announcement, was $109.25 per share. Over the weeks following March 20, defendants further clarified the scope and basis of their error, and the stock fell further, trading ultimately at prices of $20 to $30 per share.

The named plaintiffs in each of the now-consolidated actions are individual investors, who sued on their own behalf, and on behalf of all others similarly situated, including institutional investors who pur-

---

1. *See Dominic Castaldo v. MicroStrategy Inc., et al.,* Civ. No. 00-473-A (E.D. Va. March 20, 2000); *Eric Miller v. MicroStrategy Inc., et al.,* Civ. No. 00-475-A (E.D. Va. March 21, 2000); *Charles Harad v. MicroStrategy Inc., et al.,* Civ. No. 00-479-A (E.D. Va. March 21, 2000); *Lawanda Swope v. MicroStrategy Inc., et al.,* Civ. No. 00-481-A (E.D. Va. March 22, 2000); *Mitchell Kaye v. MicroStrategy Inc., et al.,* Civ. No. 00-482-A (E.D. Va. March 22, 2000); *Carolyn Spicer v. MicroStrategy Inc., et al.,* Civ. No. 00-486-A (E.D. Va. March 22, 2000); *Joel Kofsky v. MicroStrategy Inc., et al.,* Civ. No. 00-489-A (E.D. Va. March 23, 2000); *Mehran Ashrafi v. MicroStrategy Inc., et al.,* Civ. No. 00-490-A (E.D. Va. March 23, 2000); *Chris Douwes v. MicroStrategy Inc., et al.,* Civ. No. 00-499-A (E.D. Va. March 24, 2000); *Marc A. Landis v. MicroStrategy Inc., et al.,* Civ. No. 00-500-A (E.D. Va. March 24, 2000); *Stephen Hellman v. MicroStrategy Inc., et al.,* Civ. No. 00-505-A (E.D. Va. March 24, 2000); *Steve Vahovich v. MicroStrategy Inc., et al.,* Civ. No. 00-508-A (E.D. Va. March 27, 2000); *Robert Sprang v. MicroStrategy Inc., et al.,* Civ. No. 00-521-A (E.D. Va. March 28, 2000); *John Gilpin v. MicroStrategy Inc., et al.,* Civ. No. 00-545-A (E.D. Va. March 30, 2000); *Adam Block v. MicroStrategy Inc., et al.,* Civ. No. 00-

546-A (E.D. Va. March 30, 2000); *John J. Allen v. MicroStrategy Inc., et al.,* Civ. No. 00-549-A (E.D. Va. March 31, 2000); *Michael Kapadia v. MicroStrategy Inc., et al.,* Civ. No. 00-567-A (E.D. Va. April 4, 2000); *Peter Jeram v. MicroStrategy Inc., et al.,* Civ. No. 00-602-A (E.D. Va. April 10, 2000); *Steve Vahovich v. MicroStrategy Inc., et al.,* Civ. No. 00-664-A (E.D. Va. April 20, 2000); *Michael Tubbs v. MicroStrategy Inc., et al.,* Civ. No. 00-704-A (E.D. Va. April 28, 2000); *Michael Bernstein v. MicroStrategy Inc., et al.,* Civ. No. 00-779-A (E.D. Va. May 10, 2000); *Sang Chon v. MicroStrategy Inc., et al.,* Civ. No. 00-823-A (E.D. Va. May 18, 2000); *Stewart Greenebaum v. MicroStrategy Inc., et al.,* Civ. No. 00-828-A (E.D. Va. May 19, 2000); *Paul Schweitzer v. MicroStrategy Inc., et al.,* Civ. No. 00-832-A (E.D. Va. May 19, 2000). One case was initially filed in the Southern District of New York and subsequently transferred here. *See Joseph Kasell v. MicroStrategy Inc., et al.,* Civ. No. 00-921-A (E.D. Va. June 5, 2000). And one case was filed and subsequently consolidated with this action after the lead plaintiff had already been chosen. *See Jerry Krim v. MicroStrategy Inc., et al.,* Civ. No. 00-937-A (E.D. Va. June 7, 2000).

chased or sold MicroStrategy securities during the class period. *See supra* note 1. Named as a defendant in every suit is, of course, MicroStrategy, a Delaware corporation with its principal place of business in Vienna, Virginia. MicroStrategy is engaged in the business of developing and selling electronic commerce software applications and other e-business products. Also named in every suit are various individual officers and directors of MicroStrategy, including Michael Saylor, Mark Lynch, Sanju Bansal, Frank Ingari, Jonathan Ledecky, Ralph Terkowitz, Stephen Trundle, Siddhartha Banerjee, and Charles Veley.[2] Only two of the suits name MicroStrategy's auditor, PricewaterhouseCoopers, as a defendant.

The PSLRA, enacted in response to perceived abuses in securities fraud class action litigation,[3] provides district courts with a sequential roadmap for handling such cases. First, where multiple class actions alleging similar facts have been filed, a district court must entertain and resolve any motions to consolidate. *See* 15 U.S.C. § 78u-4(a)(3)(B)(ii). Next, assuming consolidation is so ordered, the district court, guided by specific statutory guidelines, must select a lead plaintiff. *See* 15 U.S.C. § 78u-4(a)(3)(B)(i). Third, the court must consider whether to approve lead plaintiff's choice of lead counsel. *See* 15 U.S.C. § 78u-4(a)(3)(B)(v).

This sequence was followed here, and by May 2000, several motions had been filed by class members seeking (i) to consolidate the cases, (ii) to be selected as lead plaintiff, and (iii) to approve the movant's choice of counsel. Among the movants were two individuals, Kazim Acar and Dominick Mazza, one institutional investor, Wolverine Trading LP, a group composed of several individuals and institutional investors

that referred to itself as "the MicroStrategy Plaintiffs' Group," and a group of individuals who sought to establish a competitive bidding process for the selection of lead counsel. Although consolidation was not raised by each movant, none of the parties, including defendants, opposed it.

After a hearing on June 2, 2000, and by Order dated June 6, 2000, the pending cases were consolidated, Dominick Mazza was appointed lead plaintiff, and Mazza's choice of counsel, the law firm Pomerantz Haudek Block Grossman & Gross LLP, was approved. The June 6 Order also established a schedule to govern the filing of the amended consolidated complaint, Rule 12 responses, and motion for certification.[4] Then, on the day the amended consolidated complaint was due, Mazza moved (i) to withdraw as lead plaintiff, (ii) to withdraw his counsel as lead counsel, and (iii) to substitute two members of the MicroStrategy Plaintiffs' Group, Atsukuni and Akiko Minami ("the Minami family") and Local 144 Nursing Home Pension Fund ("Local 144") and their choice of counsel in his and his counsel's place. Lead plaintiff's offer of a substitute for him and his counsel was not accepted; instead, by Order dated June 20, 2000, class members were invited to submit additional motions to be named lead plaintiff, and seven motions were filed in response. After consideration of these motions, and a hearing on June 27, 2000, the Minami Family and the Local 144 were selected to serve as lead plaintiffs, and their choice of lead counsel, the law firms Milberg Weiss Bershad Hynes & LeRach LLP, and Wolf Haldenstein Adler Freeman Herz LLP, was also approved. The basis for each of these rulings follows.

## II

The threshold issue under the PSLRA is consolidation. A district court

---

2. The suits are not identical in this regard; some name only two individuals, others name as many as seven.

3. *See* H.R. Conf. Rep. No. 104-369 (discussing class action abuses the PSLRA was meant to rectify); S. Rep. No. 104-98 (same).

4. This schedule was subsequently modified by consent, based on lead plaintiff's representation, through counsel, that he was not able to review the amended consolidated complaint in the allotted time owing to a family emergency.

may not choose a lead plaintiff, and approve lead counsel, until it rules on any pending motions to consolidate. *See* 15 U.S.C. § 78u-4(a)(3)(B)(ii). Although the timing of consolidation is governed by the PSLRA, the principles governing the consolidation determination are found not in the PSLRA, but in Rule 42, Fed. R. Civ. P. According to Rule 42(a), where cases "involving a common question of law or fact" are pending before a court, that court may (i) "order a joint hearing or trial of any or all the matters in issue in the actions," (ii) "order all the actions consolidated," and (iii) "make such orders concerning proceedings therein as may tend to avoid unnecessary costs or delay." In addition, a district court must consider the interest of judicial economy as well as the interest of the parties in a fair and impartial procedure. *See Johnson v. Celotex Corp.*, 899 F.2d 1281, 1285 (2d Cir.1990). In that regard, courts considering whether to order consolidation must determine whether "the specific risks of prejudice and possible confusion [from consolidation are] overborne by the risk of inconsistent adjudications of common factual and legal issues, the burden on parties, witnesses and available judicial resources posed by multiple lawsuits, the length of time required to conclude multiple suits as against a single one, and the relative expense to all concerned." *Arnold v. Eastern Air Lines Inc.*, 681 F.2d 186, 193 (4th Cir.1982). In light of these principles, consolidation is often warranted where multiple securities fraud class actions "are based on the same 'public statements and reports.'" *Werner v. Satterlee, Stephens, Burke & Burke*, 797 F.Supp. 1196, 1211 (S.D.N.Y.1992). Significantly, the existence of slight differences in class periods, parties, or damages among the suits does not necessarily defeat consolidation where the essential claims and factual allegations are similar. *See In re Cendant Corp. Litig.*, 182 F.R.D. 476, 479 (D.N.J.

1998) (noting that different class periods, and different measure of damages does not preclude consolidation); *Werner*, 797 F.Supp. at 1211 (consolidation of class actions appropriate even where cases lacked identity of parties). Accordingly, courts routinely consolidate multiple class actions that allege essentially similar, but not identical, securities claims. *See, e.g., In re Telxon Corp. Sec. Litig.*, 67 F.Supp.2d 803, 806 (N.D.Ohio 1999); *Switzenbaum v. Orbital Sciences Corp.*, 187 F.R.D. 246, 247-48 (E.D.Va.1999).

■ The same result obtains here. Each of the cases to be consolidated includes two central claims, namely (i) that defendants intentionally or recklessly misrepresented material facts with respect to MicroStrategy's revenues, in violation of § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5, the regulations issued by the SEC pursuant to § 10(b), and (ii) that certain individual defendants are liable as "controlling persons" pursuant to § 20(a) of the Act, 15 U.S.C. § 78t(a). To be sure, one of the complaints also alleges a third claim for insider trading pursuant to § 20A of the Act, 15 U.S.C. § 78t-1.[5] This is no obstacle to consolidation as it is clear that the § 20A and § 10(b) claims are inextricably intertwined, as allegations of insider trading are typically used to buttress an inference of the defendants' scienter. There are also differences among the various suits with respect to the class period and parties. While most complaints allege a class period terminating on March 20, 2000, some allege periods ending much later. In addition, the suits differ widely with respect to named individual defendants, and only two complaints allege a claim against the firm's auditor, PricewaterhouseCoopers.[6] Yet, none of these minor differences detract from the overwhelming factual and legal similarities among the cases. Moreover, it

---

5. *See Peter Jeram v. MicroStrategy Inc., et al.*, Civ. No. 00-602-A (E.D. Va. April 10, 2000).

6. *See Michael Tubbs v. MicroStrategy, et al.*, Civ. No. 00-704-A (E.D. Va April 28, 2000); *Joseph Kasell v. MicroStrategy Inc., et al.*, Civ. No. 00-921-A (E.D. Va. June 5, 2000).

is apparent that no party will suffer prejudice from consolidation, a fact confirmed by the complete absence of any opposition to consolidation. Finally, it is equally apparent that consolidation would significantly enhance judicial economy. There is, in short, nothing to be gained by requiring this matter to proceed as two dozen separate cases. For these reasons, all pending class actions were consolidated by the June 6 Order, and one additional case was consolidated after it was filed.[7]

### III

The statute next requires the selection of a lead plaintiff. *See* 15 U.S.C. § 78u-4(a)(3)(B)(i). In that regard, the PSLRA provides a sequential procedure for litigants and the district court to follow in determining who among the members of the alleged class is the "most adequate plaintiff" to serve as the lead plaintiff for the consolidated class action. The PSLRA also provides certain specific requirements that a candidate must meet to be named lead plaintiff. *See* 15 U.S.C. § 78u-4(a)(3)(B).[8] First, a complaint is not complete unless the named plaintiff includes a sworn certification setting forth certain facts designed to assure a court that the named plaintiff (i) has suffered more than a nominal loss, (ii) is not a professional litigant, and (iii) is otherwise interested and able to serve as a class representative. *See* 15 U.S.C. § 78u-4(a)(2) (discussing certification requirements).[9] Second, the first plaintiff to file a class action securities fraud complaint must publish notice of the complaint "in a widely circulated national business-oriented publication" within twenty days of filing the complaint. 15 U.S.C. § 78u-4(a)(3)(A)(i). That notice must (i) include a description of the claim and the class period, and (ii) inform other members of the alleged class that they may move, within sixty days of the notice, to be named lead plaintiff, whether or not they have filed their own complaint. *See id.* There is no dispute that this occurred here. Dominic Castaldo, the only plaintiff to file suit on March 20, 2000, was plainly the first plaintiff to file suit. He met his statutory notice obligation by issuing a press release containing the requisite information to a national business news wire service.[10]

---

7.  *See Jerry Krim v. MicroStrategy Inc., et al.,* Civ. No. 00-937-A (E.D. Va. June 7, 2000).

8.  It is important to note that the set of persons eligible to serve as lead plaintiff is not limited to the set of named plaintiffs in the various individual actions. Instead, any member of the class who meets the various statutory standards is eligible for selection as lead plaintiff. *See id.*

9.  The PSLRA requires each plaintiff to provide the following information:
    Each plaintiff seeking to serve as a representative party on behalf of a class shall provide a sworn certification, which shall be personally signed by such plaintiff and filed with the complaint, that
    (i) states that the plaintiff has reviewed the complaint and authorized its filing;
    (ii) states that the plaintiff did not purchase the security that is the subject of the complaint at the direction of plaintiff's counsel or in order to participate in any private action arising under this chapter;
    (iii) states that the plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary;
    (iv) sets forth all of the transactions of the plaintiff in the security that is the subject of the complaint during the class period specified in the complaint;
    (v) identifies any other action under this chapter, filed during the 3-year period preceding the date on which the certification is signed by the plaintiff, in which the plaintiff has sought to serve as a representative party on behalf of a class; and
    (vi) states that the plaintiff will not accept any payment for serving as a representative party on behalf of a class beyond the plaintiff's pro rata share of any recovery, except as ordered or approved by the court in accordance with paragraph (4).

10.  Worth noting is that a plaintiff may not know at the time she is preparing her suit whether her complaint will be the first complaint filed, and accordingly, she may not know whether she must issue the notice required by the statute. Indeed, each of several plaintiffs filing separately and perhaps in different jurisdictions, may believe that he or she

Within 90 days of the publication of notice, the court must determine who among the movants for lead plaintiff status is the "most adequate plaintiff" for the task of prosecuting the class action. *See* 15 U.S.C. § 78u-4(a)(3)(B)(i). In that regard, the statute provides three factors a court must consider in aid of identifying the "most adequate plaintiff." *See* 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I). Specifically, the statute creates a rebuttable presumption that the most adequate plaintiff is the "person or group of persons" who (i) "has either filed the complaint or made a motion in response to [notice given]," 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I)(aa), (ii) "has the largest financial interest in the relief sought by the class," 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I)(bb) and (iii) "otherwise satisfies the requirements of [Rule 23, Fed. R. Civ. P.]," 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I)(cc).[11] This presumption may be rebutted by evidence that the presumptively "most adequate plaintiff" (i) "will not fairly and adequately protect the interests of the class" or (ii) "is subject to unique defenses that render such plaintiff

incapable of adequately representing the class." 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II).

Each of the three statutory factors must be separately considered. The first factor is procedural, and requires consideration of whether the movant has satisfied the statute's filing requirements. *See* 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I)(aa). A potential lead plaintiff satisfies this procedural requirement by having "filed the complaint." *See id.* Although the plural of "complaint" is not used, it is nonetheless apparent that in this context the term refers to any of the individual complaints filed. Alternatively, a potential lead plaintiff satisfies the procedural requirement by moving to be named lead plaintiff within sixty days of the notice provided by the plaintiff who files the first complaint. *See id.; see also* 15 U.S.C. § 78u-4(a)(3)(A)(i)(II) (providing sixty-day period from date of notice of first complaint). A motion filed after the sixty-day period by a person who has not filed a complaint, however, is untimely, and may not, except perhaps in rare circumstances, be considered by a court.[12]

The second factor is, in many respects, the most significant inquiry, as it requires

has the first filed complaint and multiple notices may result. That issue is not presented here.

**11.** The first and third factors are nonexclusive, in that more than one class member may satisfy their requirements. The second factor, however, is exclusive; there may be only one person with the largest financial stake in the litigation. Thus, viewing the statute as a whole, it is clear that the second factor must be considered only with respect to the universe of class members who otherwise satisfy the first and third factors. *See, e.g., Switzenbaum,* 187 F.R.D. at 250 (rejecting group with largest financial interest in litigation where the group did not satisfy the third factor).

**12.** District courts applying the PSLRA note that the sixty-day time period is a significant element of the statute, and reflects Congress's sensible intent that the lead plaintiff be appointed as early in the litigation as possible. *See, e.g., In re Telxon,* 67 F. Supp. 2d at 818 ("The obvious intent of these provisions is to ensure that the lead plaintiff is appointed at the earliest possible time, and to expedite the

lead plaintiff process."); *Lax v. First Merchants Accept. Corp.,* 1997 WL 461036, at *4 (N.D. Ill. Aug 11, 1997) (discussing congressional intent in this regard). In light of this statutory intent, many courts have not allowed movants to supplement their motions to enhance their loss after expiration of the sixty-day period. *See, e.g., In re Telxon,* 67 F. Supp. 2d at 819 (ruling that "supplementation [of a claimed loss] is not contemplated by the PSLRA," even where the supplementation is based on an expansion of the class period); *Switzenbaum,* 187 F.R.D. at 250 n. 5 (E.D.Va. 1999) (refusing to allow a "group" to enhance its losses by adding members after the deadline had passed). It follows that motions filed after the sixty day period are untimely when made by a class member who has not filed a complaint.

Not presented is the question (not specifically addressed in the statute) whether a person who files a complaint after the sixty-day period expires may nonetheless move to be named lead plaintiff where that complaint is eventually consolidated with the other actions and this new plaintiff unquestionably has the largest stake in the litigation.

a district court to determine who, among the putative lead plaintiffs, has the largest financial stake in the litigation. *See.* 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I)(bb). As a preliminary matter, the district court must determine how best to approximate a person's stake in the litigation based on that person's purchases or sales of the relevant security. In that regard, the PSLRA limits damages based on a security's market price to no more than the difference in the purchase or sale prices paid or received, and the "mean trading price" over a ninety-day period beginning "on the date on which the information correcting the misstatement or omission that is the basis for the action is disseminated to the market." 15 U.S.C. § 78u-4(e)(1). Yet where, as here, lead plaintiff selection begins prior to the expiration of the ninety-day period, movants might base their loss on a sale far below the likely settle-out price. Thus, a district court comparing movants' losses must ensure that each movant's loss is calculated by reference to a common settle-out price, unless it appears that the movant sold the stock at a price above the likely settle-out price.[18]

A second implication of this factor is the now-common phenomenon of "groups" of class members who form to be named lead plaintiffs jointly, and who seek to aggregate their losses to enhance their chances of winning selection as lead plaintiff (and hence, to enhance their counsel's chances of winning selection as lead counsel). This practice is arguably invited by the PSLRA, which provides in plain terms that the presumptive lead plaintiff may be a "person *or* group of persons." *See* 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I) (emphasis added); *see also* 15 U.S.C. § 78u-4(a)(3)(B)(i) (describing the most adequate plaintiff as the "member *or* members of the purported class that the court determines to be most capable of adequately representing the interests of class members") (emphasis added). Yet, the statute is silent on a key point, namely the issue of who may join to form a group. Courts confronting this issue refer to the PSLRA's purpose, namely to combat abuse of the class action machinery in securities fraud cases by ensuring that these class actions are controlled not by law firms or professional plaintiffs with only nominal interests at stake, but by reasonably sophisticated plaintiffs with large or at least, relatively large financial stakes in the case.[14] Yet, notwithstanding general agreement as to the purpose of the PSLRA, district courts are not in agreement concerning who may join to form an

**13.** For example, in this case, several movants used diverse settle-out prices to determine their loss, ranging from $24.00 to $53.00 per share. Yet, the record reflected that the ultimate settle-out price would be closer to $50.00 per share than $20.00 per share, and a fair comparison of loss therefore required calculating each of these movants' losses by reference to a common settle-out price. On the other hand, at least one movant sold his stock for approximately $91.50 per share, a price well above the likely settle-out price. Accordingly, his damages are actually below the statutory cap, and his loss was not calculated by reference to the common settle-out price.

**14.** *See, e.g., Switzenbaum,* 187 F.R.D. at 249 ("The purpose of these provisions is to ensure that the prosecution of an action is coordinated only by those who have a serious and legitimate interest in doing so on behalf of the putative class.");*In re Baan Company Sec. Litig.,* 186 F.R.D. 214, 216-17 (D.D.C.1999)

(noting that Congress's intent was to ensure "that clients rather than lawyers control the litigation," and ruling that this is best effected by approving only small groups); *see also* H.R. Conf. Rep. No. 104-369 (discussing professional plaintiffs in class action securities litigation); S. Rep. No. 104-98 (same).

Only time will tell whether Congress has succeeded, through the PSLRA, in wresting control of securities fraud class action litigation from lawyers and professional plaintiffs. In this regard, it is worth noting that this case, not surprisingly, attracted all the "usual suspects" from the plaintiffs securities bar. Nor is this surprising, for the lead counsel appointment can be a lucrative "plum," and the "usual suspects" are in fact the same very competent, experienced and energetic lawyers who have practiced successfully in this field for years. It remains to be seen whether selection of the "most adequate plaintiff" will operate to shift at least some measure of control of the action from the lawyers to the parties.

eligible group. Some courts have concluded that a collection of plaintiffs must have some pre-litigation relationship or affiliation to constitute a group for purposes of the statute.[15] Other courts have concluded that a group of persons may be comprised of previously unrelated persons, so long as the group is small and therefore likely to be cohesive.[16] A third approach, and that adopted and followed in this case, relies on no single factor, but instead requires a "group" to "explain and justify its composition and structure to the court's satisfaction." *In re Network Associates Inc. Sec. Lit.*, 76 F. Supp. 2d 1017, 1026 (N.D.Cal. 1999) (quoting Amicus Brief of the Securities Exchange Commission filed in *Parnes, et al., v. Digital Lightwave, Inc.*, No. 99-11293 (11th Cir. Aug. 25, 1999)). Under this approach, a court may consider all relevant factors, such as "descriptions of [the group's] members, including any pre-existing relationships among them; an explanation of how its members would function collectively; and a description of the mechanism that its members and the proposed lead counsel have established to communicate with one another about the litigation." *Id.* This approach, which relies on no single factor, allows a district court maximum flexibility to select a lead plaintiff who will best represent the interests of the class[17] and exercise control of the litigation.[18]

The third statutory factor requires consideration of whether the person or group otherwise satisfies the requirements of Rule 23, Fed. R. Civ. P. *See* 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I)(cc). This inquiry need not be as "searching as the one triggered by a motion for class certification," because the inquiry focuses solely on whether the person will be an appropriate class representative, and not whether the class may ultimately be certified. *See Switzenbaum*, 187 F.R.D. at 250 (citation omitted). Accordingly, a district court need only determine (i) whether the movant's "claims or defenses ... are typical of the claims or defenses of the class" and (ii) whether the movant "will fairly and adequately protect the interests of the class." Rule 23(a)(3)(4), Fed. R. Civ. P. A person's claim is "typical" "when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." *In re Drexel Burnham Lambert Group, Inc.*, 960 F.2d 285, 291 (2d Cir.1992). And, with respect to "adequacy," a person may be an adequate representative of the class where that person (i) does not have interests that are adverse to the interests of the class, (ii) has retained com-

---

15. *See, e.g., Aronson v. McKesson HBOC, Inc., et al.*, 79 F.Supp. 2d 1146, 1153 (N.D.Cal. 1999) (determining that a "group" must have "a meaningful relationship preceding the litigation," and be "united by more than the mere happenstance of having bought the same securities"); *In re Telxon Corp. Sec. Litig.*, 67 F.Supp.2d at 813 (concluding that a group of persons cannot be "a mere assemblage of unrelated persons who share nothing in common other than the twin fortuities that (1) they suffered losses and (2) they entered into retainer agreements with the same attorney or attorneys."); *In re Donnkenny Inc. Sec. Litig.*, 171 F.R.D. 156, 158 (S.D.N.Y.1997) ("To allow lawyers to designate unrelated plaintiffs as a "group" and aggregate their financial stakes would allow and encourage lawyers to direct the litigation."); *In re Landry's Seafood Restaurant, Inc., Sec. Litig.*, 2000 U.S. Dist. LEXIS 7005 (S.D. Tex. March 30, 2000) (a group of person requires a "pre-

litigation relationship based on more than their losing investment").

16. *See, e.g., In re Baan Company Sec. Litig.*, 186 F.R.D. 214, 216-17 (D.D.C.1999) (unrelated class members may join together to form a group, but there should be no more than five or six members of the group).

17. *See* 15 U.S.C. § 78u-4(a)(3)(B)(i) (stating that the court's task is to appoint as lead plaintiff that person or persons who is "most capable of adequately representing the interests of class members"); *see also* Rule 23(a)(4), Fed. R. Civ. P. (class representative must be one who can "fairly and adequately protect the interests of the class").

18. *See supra* note 13 and accompanying text (noting that purpose of PSLRA is to ensure that plaintiffs with large stake control the litigation).

petent counsel, and (iii) is otherwise competent to serve as class representative.[19] Finally, the statute specifies two factors that may be considered to rebut the statutory presumption, namely evidence that the presumptive lead plaintiff (i) will not "fairly and adequately protect the interests of the class," or (ii) "is subject to unique defenses that render such plaintiff incapable of adequately representing the class." 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II).

These principles guided the determinations in both the first and second rounds of lead plaintiff selection, each of which is separately described.

## A. The First Round

In the first round, five individuals, institutions, or groups sought lead plaintiff status: (i) Kazim Acar, (ii) Dominick Mazza, (iii) Wolverine Trading LP,[20] (iv) the "MicroStrategy Plaintiffs' Group," and (v) the so-called "Bidding Group."[21] In the end, Dominick Mazza, an individual investor who lost between $718,000 and $848,795 on the purchase and sale of MicroStrategy securities,[22] was selected to serve as lead plaintiff, and his choice of lead counsel, the law firm Pomerantz Haudek Block Grossman & Gross LLP, was approved. This ruling is consistent with the PSLRA's requirements, as the record then reflected that (i) Mazza suffered the largest loss of the eligible movants, (ii) he satisfied the statute's procedural requirements by having moved to be named lead plaintiff within sixty days of the notice, (iii) his claims were typical of the claims of the class, in

that his claimed loss on the purchase and sale of MicroStrategy securities allegedly stemmed from defendants' misrepresentations, and (iv) he would otherwise be an adequate class representative, in that he had chosen competent counsel and appeared otherwise prepared to litigate the claims vigorously. See 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I). Accordingly, Mazza was appointed lead plaintiff, and his choice of counsel was approved.

Each of the other candidates were not selected for various reasons:

The first candidate, Kazim Acar, an individual who suffered a loss of $198,830, simply did not suffer a sufficient loss to be named lead plaintiff in this case.

The next candidate, Wolverine Trading LP, an institutional investor that specializes in options trading for its own account, was not selected for other reasons. Although Wolverine Trading's loss was apparently very large, the evidence it submitted did not permit a confident conclusion that its loss was as large as it averred: While the other candidates set forth in clear terms the specific transactions that led to a loss, Wolverine submitted a conclusory affidavit and a collection of indecipherable financial statements that purported to support the affidavit's conclusion. In any event, even assuming Wolverine Trading's evidence of loss was sufficient, its application did not satisfy the statutory requirements of typicality and adequacy, see 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I)(cc), nor did it survive the

19.  See, e.g., In re Drexel Burnham Lambert, 960 F.2d at 291; Switzenbaum, 187 F.R.D. at 250; Talbott v. GC Servs. Ltd. Partnership, 191 F.R.D. 99 (W.D.Va.2000).

20.  Wolverine Trading was initially joined by George D. Bjurman and Associates, but that company withdrew from the motion at the initial hearing.

21.  Of the movants, only Stewart Greenebaum, a member of the MicroStrategy Plaintiffs' Group, and Steve Vahovich, a member of the Bidding Group, were named plaintiffs in one of the consolidated actions. Accordingly, the

remainder of the movants satisfied the procedural requirement for the rebuttable presumption by a timely motion for appointment as lead plaintiff in response to the statutory notice. See 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I)(aa).

22.  See 15 U.S.C. § 78u-4(e)(1) (requiring damages to be based on the mean trading price for the 90 days after the correction was released, which period has yet to expire). In light of this section of the statute, the actual "damages" are estimates.

additional statutory provision with respect to rebuttal, *see id.* § 78u-4(a)(3)(B)(iii)(II). Evidence presented at the first round, and again at the second round, confirmed that Wolverine Trading was an atypical investor that engages in transactions far beyond the scope of what a typical investor contemplates. *See, e.g., In re Bank One Shareholders Class Actions,* 96 F.Supp.2d 780, 783–84 (N.D.Ill.2000) (rejecting a hedge fund as a lead plaintiff). Accordingly, Wolverine Trading may have been subject to unique defenses based on its method of doing business.[23] For these reasons, Wolverine Trading was not an adequate class representative. *See* Rule 23(a), Fed. R. Civ. P.; *see also* 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II) (noting that rebuttable presumption may be rebutted by evidence that the presumptive lead plaintiff "is subject to unique defenses that render such plaintiff incapable of adequately representing the class").

The next candidate was a group of class members with no prior relationship who referred to themselves as the MicroStrategy Plaintiffs' Group. The group was comprised of the following persons or entities: (i) the Minami family, (ii) Local 144, (iii) KMF Partners LP, (iv) Digital Ventures Group Ltd., and (v) Dr. Barry Jansen, an individual.[24] During the first round, the movants did not dispute that none of the members of this group individually suffered a larger loss than Mazza.[25] Instead, these class members sought to proceed as a "group" and to have their losses aggregated for purpose of lead plaintiff selec-tion. Yet, there was nothing in the record to provide any assurance that the group was cohesive, comprised of like-minded members, or otherwise likely to function as a unified group. The group failed to present evidence with respect to its formation, its operational structure, or whether the members of the group had ever communicated with one another about their roles. Furthermore, this group retained *three* law firms to serve as co-lead counsel; this fact suggests the group was merely a diverse collection of plaintiffs assembled by these three firms for the purpose of winning the lead plaintiff role, allowing them to share the lead counsel role. *Cf. In re Telxon,* 67 F. Supp. 2d at 813 (noting that the retention of multiple law firms to represent multiple members of a "group" is evidence that the group is not unified). The only record evidence suggesting that the group would function as a group was counsel's representation that they were "cohesive," which was not sufficient in the absence of any record evidence supporting that representation. For these reasons this group's motion was denied.

The final candidate was the so-called "Bidding Group," a collection of apparently unrelated plaintiffs whose aggregated losses did not exceed Mazza's. But this fact, the group urged, should be no impediment to its selection, given the group's imaginative, if unauthorized proposal to abandon the statutory lead plaintiff selection procedure and adopt instead a competitive bidding process. In so doing, the group argued, legal fees would be set competitively

---

**23.** One potential unique defense emerged at the second round, as Wolverine Trading's own evidence submitted in that round suggested that most of its losses occurred *before* defendants issued the first correction on March 20, 2000. The average member of the class, on the other hand, bought the stock before the correction was announced, when the market was allegedly relying on false information, and sold it after the announcement, after the market had allegedly taken the correction into account. Accordingly, Wolverine Trading may be subject to unique defenses based on the timing of its loss.

**24.** Stewart Greenebaum was initially a member of this group, but he withdrew his candidacy on the eve of the first hearing.

**25.** The Minami Family, who suffered the largest loss of the members of this group, was represented to have lost, at most, $776,750. As was revealed during the second round, the Minami family suffered a greater loss than Mazza, but due to counsel's error, a much lower figure was presented in a summary of the MicroStrategy Plaintiffs' Group's loss and in each of the pleadings submitted by the group.

and hence they would be lower than fees would be otherwise. The short answer to this argument is that it funds no warrant in the statute. The PSLRA plainly states that a district court's duty is to appoint a lead plaintiff based on the relevant statutory criteria, *see* 15 U.S.C. 78u-4(a)(3)(B)(i), while it is the lead plaintiff's duty to "select and retain counsel to represent the class," 15 U.S.C. 78u-4(a)(3)(B)(v). And, while plaintiff's selection of lead counsel is "subject to the approval of the court," *id.*, approval should not be based on whether plaintiff's chosen counsel promises to charge a cheaper fee than anyone else. The ultimate fee structure is within a district court's control throughout the litigation, because, at the conclusion of the litigation, a district court has a statutory obligation to ensure that the ultimate award of attorney's fees is reasonable. *See* 15 U.S.C. § 78u-4(a)(6) (limiting recovery of attorney's fees to a "reasonable percentage of the amount of any damages and prejudgment interest actually paid to the class"). Instead, a district court should approve plaintiff's choice of lead counsel based solely on that counsel's competence, experience, and resources, saving the question of fees until the conclusion of the litigation.

## B. *The Second Round*

As noted, Mazza ultimately withdrew as lead plaintiff, following which additional motions for lead plaintiff status were solicited. Seven applications were filed in response: (i) the Minami family[26] and Local 144, two members of the MicroStrategy Plaintiffs' Group from the first round, applied as a new group, (ii) Wolverine Trading renewed its application, (iii) the Bidding Group renewed its application, but under a new theory, (iv) the New York City Employees Retirement System ("NYCERS") moved to be named lead plaintiff for the first time, (v) Paul Schweitzer moved to be named lead plaintiff for a separate class or subclass of persons who traded in MicroStrategy options, (vi) Dr. Brian Johnson, an individual, sought to be appointed lead plaintiff for the first time, and finally (vii) David Allison, also an individual, moved to be named lead plaintiff for the first time, and was the only individual candidate who appeared at the hearing.

As it turned out, the merits of the lead plaintiff selection process were actually subserved by Mazza's decision to withdraw, as it became apparent during the second round of briefing that the Minami family had actually suffered a much greater loss than the loss reported by Mazza, a fact apparent from the Minami family's certificate, but misstated in the MicroStrategy Plaintiffs' Group's pleadings in the first round.[27] Thus, during the second round, it was quite evident (i) that the Minami family suffered the largest loss of any investor who had timely filed an application for lead plaintiff status, and who was otherwise eligible to be named lead plaintiff, (ii) that their claims were typical of the class, and (iii) that the record reflected they would otherwise be adequate representatives, as there were no apparent conflicts between the Minami family and the class, they had chosen competent counsel, and were otherwise prepared to serve as class representatives.[28]

26. Atsukuni and Akiko Minami are husband and wife.

27. In the first round, the lawyers for the MicroStrategy Plaintiffs' Group represented that the Minami family had lost between $636,642 and $776,750 based on the purchase of 4700 shares of MicroStrategy stock. This figure was undisputed at the hearing, and appeared in the MicroStrategy Plaintiffs' Group's pleadings, as well as a chart attached as an exhibit. In fact, however, the Minami family suffered

a loss in excess of $900,000, based on the purchase and subsequent sale of 6080 shares of the common stock from February through March 20, 2000. The source of this error was lawyer oversight, as the underlying facts were stated in the Minami family's certificates.

28. Indeed, Atsukuni Minami submitted an affidavit in which he affirmed his interest in being lead plaintiff, and provided information that supported both his desire and his ability to undertake that task. Mr. Minami stated that

Even though the Minami family qualified to serve as lead plaintiff, they wished to serve as co-lead plaintiffs with the largest institutional investor in the MicroStrategy Plaintiffs' Group, Local 144, a pension fund that manages $425 million on behalf of approximately 12,000 beneficiaries. These two members again provided only scant evidence as to how they would function as a group. Nonetheless, other factors suggested that these two class members should be allowed to proceed as a group. First, the group is composed of a small number of persons: the Minami family includes two people, Mr. and Mrs. Minami, and Mr. Minami apparently manages both of their finances, while Local 144 is a single entity. Accordingly, in terms of practical effect, there are only two members of this group. Second, the Minami family and Local 144 each represent a distinct type of investor in this class, respectively, individual and institutional investors, and each will bring a distinct and relevant perspective to this litigation. Third, the recent experience with Mazza suggests that combining an institutional and an individual investor may help stabilize the litigation. Fourth, the Minami family and Local 144 discussed the lead plaintiff process prior to the second round to discuss joining together as co-lead plaintiffs, which bodes well for coordination and cohesiveness among the group in the future. Finally, the Minami family would be named lead plaintiff notwithstanding whether its loss is aggregated with that of Local 144. In all these circumstances, it was appropriate to allow the Minami family and Local 144 to proceed as a group.

The other candidates, as in the first round, failed for diverse reasons. The first two candidates, Dr. Brian Johnson and David Allison, each individually sought to be named lead plaintiff, yet neither suffered a loss as large as the Minami family's. Wolverine Trading renewed its application to be named lead plaintiff, and in its motion, attempted, with little success, to clarify the source and magnitude of its losses and the nature of its business. Yet, to the extent Wolverine clarified either aspect, it only further confirmed what was suggested by the record in the first round, namely that Wolverine, by virtue of its manner of business, may be subject to unique defenses. The Bidding Group also renewed its application, but this time sought appointment based solely on its counsel's presentation of its fee schedule.[29] Because this proposal, like the first, finds no warrant in the PSLRA, it, too, must fail. *See* 15 U.S.C. § 78u-4(a)(3)(B)(v).

The NYCERS application fails procedurally. An institutional investor, NYCERS claims to have losses in excess of $3 million, and for that reason, all things being equal, its application might well have won the selection. Yet, NYCERS did not satisfy a procedural predicate required for the statutory presumption; it neither filed one of the now-consolidated complaints, nor did it file a motion to be named lead plaintiff within the sixty-day time period. *See* 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I)(aa) (lead plaintiff must have "either filed the complaint or made a motion in response to a notice" required by § 78u-4(a)(3)(A)(i)(II) (setting sixty day time limit for filing a motion to be named lead plaintiff)). Further, even assuming a district court may

(i) he was once Assistant Vice President of the Bank of Tokyo Trust Company in New York, but is now retired, (ii) he is responsible for managing his family's savings, (iii) he follows his investments closely, and on a daily basis, (iv) he contacted Wolf Haldenstein, his counsel of choice, on his own, and (v) he decided to pursue lead plaintiff status to "protect [his] family's investment and seek to recover as much as [he] could for [himself], and for other investors."

29. The Bidding Group's lawyer represented that it would charge no fee if it recovered less than $50 million, $10 million in the event that it recovered between $50 million and $100 million, and 10% of the recovery if it exceeds $100 million, in an amount not to exceed $75 million.

extend the relevant statutory deadline in certain circumstances, NYCERS has shown no good cause for doing so in this case: it has failed to provide a satisfactory explanation for why it did not file a timely motion to be named lead plaintiff. Other class members satisfied the statute's requirements, and as discussed above, convincing authority and Congress's intent suggest that the statute's time limits should be strictly enforced.[30] Accordingly, NYCERS could not be lead plaintiff, because it failed to satisfy the first statutory factor.

■ Finally, Paul Schweitzer sought to be named lead plaintiff for a separate "Call Options Class." At the time of the second round, there was no separate class or subclass related to the sale or purchase of options. Moreover, the record at that point suggested that the claims of options-holders and stockholders are in most cases sufficiently similar that they should be consolidated "in form and in fact," and thus litigated by the same lead plaintiff and lead counsel. See In re Orbital Sciences Corp. Securities Litig., 188 F.R.D. at 240. In any event, even assuming proper class certification required a separate subclass of options-holders, the PSLRA requires a district court to appoint a single lead plaintiff or lead plaintiff group for each class action; there is no provision for multiple lead plaintiffs other than those joined as a group. See 15 U.S.C. § 78u-4(a)(3)(B). To the extent a subclass or - classes represented by separate counsel are required for the proper administration of this litigation and representation of the members of the class, that issue may be addressed at a later stage pursuant to Rule 23, Fed. R. Civ. P.

For these reasons, the Minami family and Local 144 were named lead plaintiffs of this litigation.

## IV

■ The final step in the lead plaintiff process is approval of the lead plaintiffs' choice of lead counsel. See 15 U.S.C. § 78u-4(a)(3)(B)(v). In this case, the lead plaintiffs selected and retained two law firms to serve as lead counsel: Milberg Weiss Bershad Hynes & LeRach LLP, and Wolf Haldenstein Adler Freeman Herz LLP. It is undisputed that both firms are competent and experienced in class action securities fraud litigation and that both have the resources to serve effectively as co-lead counsel. There is, however, some question whether two law firms should be allowed to serve as co-lead counsel. Some courts disapprove of complicated structures for lead counsel, on the ground that the PSLRA contemplated "one strong plaintiff with one counsel who will speak on its behalf." See In re Telxon, 67 F. Supp. 2d at 817 (finding that use of three firms as co-lead counsel, an executive committee of seven additional firms, and one more firm as liaison counsel, was too complex and contrary to the purpose of the PSLRA). There is a further concern that fees would be unnecessarily increased were there to be two lead counsel firms. Nonetheless, the statute does not explicitly restrict lead counsel to one law firm, and there may be instances in which a class is well-served by having two or more law firms combine to direct the litigation. Thus, other courts have held that multiple law firms could share lead counsel duties so long as those firms provided assurance that they would "work together efficiently and without duplication of services."[31] In this event, the primary inquiry is whether co-lead counsel will enhance, rather than reduce, the efficiency of the litigation.

In these circumstances, the Minami family's and Local 144's desire to proceed with

---

30. See supra note 11 and accompanying text.

31. In re First Union Corp., 2000 U.S. Dist. LEXIS 2267, at *14 (W.D.N.C. Jan. 28, 2000); see also Tarica v. McDermott Int'l, Inc., 2000 WL 377817, at ** (E.D.La. April 13, 2000)

(co-lead counsel approved, on condition "that (1) there shall be no duplication of attorneys' services; (2) the use of co-lead counsel will not in any way increase attorneys' fees and expenses").

two law firms as lead counsel was reasonable. First, it was apparent that both the Minami family and Local 144 had strong, and (in the case of Local 144) pre-existing relationships with their firms, and a desire to continue working with them in this litigation.[32] Second, it appeared from the record that allowing these two firms to act jointly would benefit the class; the two firms have already worked together in other litigation, and this history suggests they work well together. Third, the structure they propose is not complex; the two firms seek only to share resources and divide labor, a reasonable request given that they are opposed by two large law firms. Accordingly, it was appropriate to respect the lead plaintiffs' choice of counsel, and permit the two firms to act as co-lead counsel in this case.

Lead plaintiffs, pursuant to direction, have filed an amended consolidated complaint in which they allege violations of (i) § 10(b) of the Securities Exchange Act by MicroStrategy, PricewaterhouseCoopers, and the individual defendants, and (ii) §§ 20(a) and 20A of the Act by certain individual defendants. By stipulation, the class has since been conditionally certified to encompass all persons who purchased or sold MicroStrategy securities during the class period (June 11, 1998 through March 20, 2000), and were damaged thereby, and a subclass has also been conditionally certified, encompassing those who were allegedly damaged by certain of the individual defendants' insider trading. Motions to dismiss by all defendants are pending.

An appropriate Order has entered. The Clerk is directed to send a copy of this Memorandum Opinion to all counsel of record.

---

**32.** Mr. Minami investigated several firms, hired Wolf Haldenstein based on that research, and has continued to receive the firm's advice and counsel even after the MicroStrategy Plaintiffs' Group's motion failed.

Local 144 has an even stronger relationship with its firm: Milberg Weiss is Local 144's counsel of choice for all securities fraud matters, not just the present case.