## In re MICROSTRATEGY, INC. SECURITIES LITIGATION

No. CIV. A. 00–473–A.

United States District Court,
E.D. Virginia,
Alexandria Division.

Oct. 26, 2001.

Harvey B. Cohen, Cohen, Gettings & Dunham, Arlington, VA, Craig Crandall Reilly, Richards, McGettigan, Reilly & West, P.C., Alexandria, VA, for Plaintiffs.

Joseph Andrew Keyes, Edward John Bennett, Williams & Connolly, Washington, D.C., Leo Stephen Fisher, Bean, Kinney & Korman, P.C., Arlington, VA, for Defendants.

### MEMORANDUM OPINION

ELLIS, District Judge.

This federal securities fraud class action has settled. Specifically, plaintiffs settled their claims against the MicroStrategy Defendants[1] for a total consideration (payable wholly in notes, common stock, and warrants) valued at $98.5–137.5 million, depending on the market for the securities.[2] And plaintiffs' claims against PricewaterhouseCoopers ("PwC") were settled for a total cash consideration of $55 million.[3] Both settlements were judicially approved as fair and reasonable following the requisite notice to the class and opportunity to object.[4] *See In re Microstrategy, Inc. Sec. Litig.*, 150 F.Supp.2d 896 (E.D.Va.2001); *In re MicroStrategy, Inc. Sec. Litig.*, 148 F.Supp.2d 654 (E.D.Va.2001). Only questions relating to an award of reasonable fees and costs to lead counsel remain to be resolved.[5]

### I.

Only brief recapitulations of the consolidated complaint and the procedural history are necessary here; more complete discussions may be found in the four prior published opinions in this case.[6] In summary, this is a federal securities class action brought against the MicroStrategy Defen-

---

1. The term "MicroStrategy Defendants" includes (i) MicroStrategy, Inc. ("MicroStrategy") and (ii) certain officers of MicroStrategy ("Individual Defendants").

2. The settlement with the MicroStrategy defendants ("MicroStrategy settlement") was valued at approximately $137.5 million when plaintiffs entered into a Memorandum of Understanding with the MicroStrategy Defendants on October 23, 2000. By the time this settlement was judicially approved on April 2, 2001, the value of the settlement had fallen to approximately $98.5 million.

3. The cash settlement with PwC ("PwC settlement") is valued at approximately $55 million as of October 29, 2001. This includes $51 million in principal plus interest at 7% calculated from September 15, 2000, the date PwC's Rule 12(b)(6) motion to dismiss the suit was denied. The actual amount deposited by PwC into the settlement fund on October 29, 2001 will be $54,713,386.90, which reflects a settlement amount of $55,021,095.88 and a credit of $307,708.98 for funds advanced by PwC to cover the cost of giving notice of the PwC settlement to the class.

4. The single class member who noted an objection to the settlement with the MicroStrategy Defendants withdrew that objection prior to the hearing concerning the fairness and adequacy of the settlement. No class member objected to the PwC settlement.

5. This includes a petition for costs from the law firm of Pomerantz Haudek Block Grossman & Gross LLP, which was originally appointed lead counsel in the consolidated action, but lost that position when the originally appointed lead plaintiff withdrew. *See infra* note 10.

6. *See In re Microstrategy, Inc. Sec. Litig.*, 150 F.Supp.2d 896 (E.D.Va.2001) (approving plaintiffs' settlement with PwC); *In re MicroStrategy, Inc. Sec. Litig.*, 148 F.Supp.2d 654 (E.D.Va.2001) (approving plaintiffs' settlement with the MicroStrategy Defendants); *In re MicroStrategy, Inc. Sec. Litig.*, 115 F.Supp.2d 620 (E.D.Va.2000) (denying mo-

dants and PwC on behalf of all persons who purchased MicroStrategy common stock or call options or sold MicroStrategy put options during the period June 11, 1998 through March 20, 2000 (the "class period"). On behalf of this class, the consolidated complaint asserts securities fraud claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), as amended by the Private Securities Litigation Reform Act of 1995 ("PSLRA"), and under Rule 10b–5 promulgated pursuant to the Exchange Act.[7] Also included in the consolidated complaint are fraud claims under Section 20A of the Exchange Act[8] brought on behalf of a subclass of persons who purchased MicroStrategy stock contemporaneously with the sales of MicroStrategy stock by the Individual Defendants.

The precipitating event for this action was MicroStrategy's March 20, 2000 announcement that its 1998 and 1999 financial statements had to be restated to correct previously reported profits as significant losses. Following this announcement, the price of MicroStrategy stock fell precipitately from $266.75 per share at closing on Friday, March 17, 2000 to $86.75 per share by the market's close on Monday, March 20, 2000. Plain-

tiffs alleged that, over a period of two years, MicroStrategy, at the direction of the Individual Defendants, repeatedly published materially false financial statements relating to MicroStrategy's financial condition. PwC, for its part, (i) issued unqualified audit opinions stating that the financial statements were in compliance with Generally Accepted Accounting Principles[9] and (ii) allegedly participated in the preparation of MicroStrategy's quarterly reports, which contained the same misrepresentations and omissions about the company's financial condition. These statements, according to the consolidated amended complaint, transformed millions of dollars of losses into reported profits and caused the price of MicroStrategy common stock and options to be artificially inflated or distorted during the class period.

Approximately two dozen class action securities fraud actions were filed in this district against MicroStrategy and other defendants. Threshold motions in various of those actions led to the consolidation of the actions and the designation of lead plaintiffs and lead counsel, all pursuant to the PSLRA, 15 U.S.C. § 78u–4(a)(3). See In re MicroStrategy, Inc. Sec. Litig., 110 F.Supp.2d 427 (E.D.Va.2000).[10]

---

tions to dismiss); In re MicroStrategy, Inc. Sec. Litig., 110 F.Supp.2d 427 (E.D.Va.2000) (appointing lead plaintiff and lead counsel).

7. 15 U.S.C. §§ 78j(b), 78t(a); 17 C.F.R. § 240.10b–5.

8. 15 U.S.C. § 78t–1.

9. Generally Accepted Accounting Principles "are the conventions, rules, and procedures that define accepted accounting practices." United States v. Arthur Young & Co., 465 U.S. 805, 811 n. 7, 104 S.Ct. 1495, 79 L.Ed.2d 826 (1984).

10. A brief history of this process is warranted here. Initially, Dominick Mazza was appointed lead plaintiff because it was apparent that

he had suffered the greatest loss among the five applicants. Mazza's choice of lead counsel (Pomerantz Haudek Block Grossman & Gross LLP) was also approved. See In re MicroStrategy Inc. Sec. Litig., No. 00–473–A (E.D. Va. June 6, 2000) (order); see also 15 U.S.C. § 78u–4(a)(3)(B)(iii) and (v). Shortly thereafter, Mazza, citing personal reasons, successfully sought leave to withdraw as lead plaintiff and to withdraw his counsel as lead counsel. Additional motions for lead plaintiff were then solicited. Atsukuni and Akiko Minami ("the Minami family") and Local 144 Nursing Home Pension Fund ("Local 144") applied to be co-lead plaintiffs. The Minami family reported losses in excess of $900,000. Local 144 reported losses of approximately $610,000. The Minami family had the great-

Thereafter, on July 17, 2000, the MicroStrategy Defendants and PwC filed motions to dismiss under Fed.R.Civ.P. Rule 12(b)(6). Formal discovery in the case was stayed pending resolution of the defendants' motions to dismiss.[11] Nevertheless, plaintiffs continued their investigation of the underlying facts of the litigation, reviewing documents obtained from both public and private sources, conferring with consultants regarding the allegations in the consolidated complaint, and identifying, locating, and interviewing witnesses able to provide information relevant to the case. While the motions to dismiss were pending, the MicroStrategy Defendants broached the possibility of settlement and thereafter engaged the lead plaintiffs and their counsel in intensive and extensive settlement discussions. As a result of these discussions, plaintiffs and the MicroStrategy Defendants, on September 15, 2000, adopted an agreement in principle to settle and release the claims asserted against the MicroStrategy Defendants in exchange for consideration valued at $137.5 million. That same day, both motions to dismiss were denied, with the exception of defendant Ingari's motion to dismiss plaintiffs' claim under Section 20A of the Exchange Act, which was granted. *See In re MicroStrategy, Inc. Sec. Litig.*, 115 F.Supp.2d 620, 664–65 (E.D.Va.2000).

Plaintiffs continued to press their case against PwC and, in this regard, they launched an intensive, multi-pronged discovery effort that involved the acquisition of documentary and testimonial evidence from PwC, the MicroStrategy Defendants,[12] and various nonparties. This discovery included, for example, two requests for production of documents directed to PwC, one request for production of documents directed to the MicroStrategy Defendants, and forty-two subpoenas *duces tecum* directed to nonparties. These initiatives ultimately yielded approximately 450,000 pages of documents. In addition, plaintiffs engaged in a comprehensive deposition program,[13] and served four sets of interrogatories upon PwC.

---

est loss among the movants, was otherwise qualified to serve as lead plaintiff, and was appointed. Local 144 was appointed as co-lead plaintiff because of the then-apparent magnitude of its losses, *see infra* note 14, and the balance it could provide to the litigation as an institutional investor. *See In re MicroStrategy*, 110 F.Supp.2d at 439. Plaintiffs' choices of co-lead counsel, Wolf Haldenstein Adler Freeman Herz LLP ("Wolf Haldenstein") for the Minami family and Milberg Weiss Bershad Hynes & Lerach LLP ("Milberg Weiss") for Local 144, were also approved. *See In re MicroStrategy, Inc. Sec. Litig.*, No. 00–473–A (E.D. Va. June 27, 2000) (order). By Order dated August 10, 2000, as amended on August 25, 2000, the class was conditionally certified and Akiko and Atsukini Minami, Local 144 Pension Fund, Vera Schwartz, and Paul Schweitzer were appointed class representatives. *See In re MicroStrategy, Inc. Sec. Litig.*, No. 00–473–A (E.D.Va. Aug. 10, 2000) (order regarding class certification); *In re MicroStrategy, Inc. Sec. Litig.*, No. 00–473–A (E.D.Va. Aug. 25, 2000) (amended order regarding class certification).

11. *See* 15 U.S.C. § 78u–4(b)(3)(B) (requiring that discovery and other proceedings be stayed during the pendency of any motion to dismiss).

12. As part of the partial settlement reached between plaintiffs and the MicroStrategy Defendants, the MicroStrategy Defendants agreed not to interfere with plaintiffs' efforts to obtain production or necessary information from PwC, which continued as the company's outside auditor, and to refrain from asserting any right to a discovery stay had PwC sought reconsideration of the denial of PwC's threshold dismissal motion or sought to take an interlocutory appeal. In addition, to aid plaintiffs in their discovery efforts against PwC, the MicroStrategy Defendants agreed to confidential interviews, to which PwC was not granted access.

13. Deposed were (i) present and former PwC partners and employees who were either involved in the audits of the original MicroStrategy financial statements and restatements, or in matters relating to PwC's role as a reseller and/or systems integrator of MicroStrategy

Plaintiffs, in turn, were required to respond to discovery requests propounded by PwC, including document requests, interrogatories, and depositions.[14] Finally, plaintiffs conducted extensive expert discovery, retaining damages and accounting/auditing experts who prepared reports and were deposed by PwC, and deposing PwC's three designated experts.

The parties also engaged in extensive motions practice beyond the defendants' motion to dismiss. PwC filed a motion for partial summary judgment seeking to narrow the class and later filed a motion to decertify the class. Plaintiffs opposed both motions. On or about April 27, 2001, before plaintiffs' response to PwC's motion to decertify the class was due, PwC and plaintiffs reached an agreement in principle to settle and release plaintiffs' claims against PwC. By the time the parties reached this agreement, they had completed extensive work to prepare for trial, which was scheduled to begin just a month later. In this regard, plaintiffs and PwC had filed their trial witness lists, exhibit lists,[15] and deposition designations, and

plaintiffs were well into the process of formulating objections to PwC's designated trial exhibits and preparing motions in limine. Plaintiffs also had developed databases for use at trial, and had retained trial consultants to advise and assist counsel in managing, through computer and video technology, the presentation of documentary and videotaped-deposition evidence at trial.

It is quite apparent that plaintiffs' settlement with the MicroStrategy defendants and their settlement with PwC were the culmination of exhaustive and extensive arm's-length negotiations between plaintiffs' co-lead counsel and defense counsel. In connection with the request for judicial approval of each of the settlements, lead counsel submitted a detailed petition for costs and attorneys' fees. The task at hand is to determine a reasonable and fair award of costs and attorneys' fees to lead counsel.

## II.

The PSLRA, like many modern statutory remedial schemes, deviates from the so-called "American Rule"[16] by provid-

products; (ii) senior officers and directors of MicroStrategy; (iii) representatives of certain MicroStrategy customers; (iv) the lead underwriter of the company's proposed securities offering; and (v) PwC's designated accounting/auditing and damages experts. Plaintiffs also conducted interviews of numerous present and former employees of MicroStrategy, as well as various nonparties with potentially relevant information.

14. In the course of responding to PwC's discovery requests, Milberg Weiss discovered that Local 144's losses from purchases of MicroStrategy common stock had been overstated in the certification accompanying Local 144's application to be named co-lead plaintiff and in a supplemental declaration signed by Local 144's Chairman of the Board. Instead of $610,000, Local 144's actual losses were only about $80,000. The original certification was prepared by Local 144's counsel, Milberg Weiss, and the authorized representa-

tive of Local 144 relied upon Milberg Weiss when signing the certifications. Milberg Weiss's resulting mistake was innocent, an act of negligence rather than bad faith. Yet without the mistake and the resulting inflated loss figure, Local 144 would not have been named co-lead plaintiff, and Milberg Weiss would not have been named co-lead counsel.

15. Plaintiffs' exhibit list contained approximately 550 document designations, and PwC's list approximately 1,500.

16. The American Rule holds that parties are responsible for their own attorneys' fees regardless of the outcome of the case. See Alyeska Pipeline Serv. Co. v. Wilderness Soc'y, 421 U.S. 240, 247, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975). Among the numerous statutory exceptions to this rule are the remedial schemes relating to consumer protection and safety, employment discrimination, and civil rights violations. See, e.g., Equal Credit Op-

ing for an award of attorneys' fees and costs out of any recovery obtained by plaintiffs in a securities fraud class action.[17] But while allowing for attorneys' fees from any class recovery, the PSLRA adds this qualification: "Total attorneys' fees and expenses awarded by the court to counsel for the plaintiff class shall not exceed a reasonable percentage of the amount of any damages and prejudgment interest actually paid to the class." 15 U.S.C. § 78u–4(a)(6). Lead counsel argue that the PSLRA, with this provision, has adopted a percentage-of-recovery method for compensating lead counsel in securities actions. This argument is unpersuasive. Lead counsel's construction of the provision contradicts its plain meaning and, significantly, has not been adopted by any court. To the contrary, courts considering this issue have concluded, consistent with the PSLRA's legislative history,[18] that the provision, read carefully, is a *limitation* on the fees and expenses awarded by a court, not a prescription for the methodology to be used in computing the fees and expenses.[19] Put simply, the effect of this language is merely to impose on courts "an independent obligation to ensure the reasonableness of any fee request." [20]

■ Given that the PSLRA does not prescribe a methodology for computing fees and expenses, courts faced with the task of assessing the reasonableness of a request for fees and expenses in a PSLRA

portunity Act § 706(e), 15 U.S.C. § 1691e(d); Fair Labor Standards Act of 1938, § 16(b), 29 U.S.C. § 216(b); Civil Rights Attorneys' Fees Awards Act of 1976, § 2, 42 U.S.C. § 1988. More apposite here is the "common fund" exception to the American Rule, which holds that an attorney "who recovers a common fund for the benefit of persons other than himself is entitled to a reasonable attorney's fee from the fund as a whole." *Boeing Co. v. Van Gemert,* 444 U.S. 472, 478, 100 S.Ct. 745, 62 L.Ed.2d 676 (1980). In the class action context, the common fund doctrine is grounded in the belief that to deny attorneys a recovery of their fees from the funds they helped create would unjustly enrich the class members at the expense of their attorneys and representatives. *See id.* at 478, 100 S.Ct. 745.

17. *See* 15 U.S.C. § 78u–4(a)(6), (a)(7)(C) (limiting any award of attorneys' fees and expenses to a "reasonable percentage" of any recovery and requiring that settling parties and their counsel who intend to seek attorneys' fees from a recovery include their request in the notice of settlement terms sent to class members).

18. The PSLRA Conference Committee Report leaves no doubt on the conferees' intent on this point:

By not fixing the percentage of fees and costs counsel may receive, the Conference Committee intends to give the court flexibility in determining what is reasonable on a case-by-case basis. The Conference Com-

mittee does not intend to prohibit use of the lodestar approach as a means of calculating attorney's fees. *The provision focuses on the final amount of fees awarded, not the means by which such fees are calculated.* H.R. Conf. Rep. 104–369, at 36 (1995), *reprinted in* 1995 U.S.C.C.A.N. 730 (emphasis added).

19. *See, e.g., Powers v. Eichen,* 229 F.3d 1249, 1258 (9th Cir.2000) ("The legislation's primary purpose was to prevent fee awards under the lodestar method from taking up too great a percentage of the total recovery.").

The provision's reference to both fees and expenses provides additional support for reading the provision simply as a limitation. To conclude otherwise would mean that expenses, as well as fees, should be awarded only as a percentage of the fund, which is contrary to the accepted and sensible practice of basing an award of expenses on an assessment of the nature and reasonableness of *actual* expenses incurred. *See In re Synthroid Mktg. Litig.,* 264 F.3d 712, 722 (7th Cir.2001) (holding that reimbursable litigation expenses should be set at the level the market permits); *Harris v. Marhoefer,* 24 F.3d 16, 19 (9th Cir. 1994) (holding that those costs typically billed by attorneys to paying clients in the marketplace may be reimbursed).

20. *In re Cendant Corp. Litig.,* 264 F.3d 201, 281–82 (3d Cir.2001).

case have the flexibility to make use of whatever methodology may seem appropriate in the circumstances. In this respect, courts have typically used two methods to calculate attorneys' fees awards in common fund cases, including securities cases: (i) the lodestar method and (ii) the percentage-of-recovery method.[21]

■ Under the lodestar method of calculating attorneys' fee awards in common fund cases,[22] the trial court must first determine the hours reasonably expended by counsel that created, protected, or preserved the fund. Then, the number of compensable hours is multiplied by a reasonable hourly rate for the attorneys' services to produce a lodestar figure. Finally, the lodestar figure may then be increased or decreased based on an assessment of a variety of factors relating to the nature of the case, the market for such legal services, and the result achieved.[23]

■ The percentage-of-recovery method does not depend on counsels' hourly rates or billable hours; it is, instead, based on a percentage of the common fund, with the precise percentage selected by the trial court with reference to essentially the same case-specific factors used to adjust, or determine a multiplier for, a lodestar

---

**21.** *See Goldberger v. Integrated Res., Inc.,* 209 F.3d 43, 47 (2d Cir.2000). Although these two methodologies dominate the fee award field, other approaches have been suggested and used. The Seventh Circuit has urged the use of a market-mimicking approach, suggesting that, before litigation begins, a trial judge should "design a fee structure that emulates the incentives a private client would put in place." *Synthroid,* 264 F.3d at 719. In the same vein, several district courts have used a so-called "auction"method, in which candidates for lead counsel submit proposals detailing their proposed fee structures, experience, and other benefits they will bring to the litigation. *See, e.g., In re Oracle Sec. Litig.,* 131 F.R.D. 688 (N.D.Cal.1990), 132 F.R.D. 538 (1990), and 136 F.R.D. 639 (1991); *In re Amino Acid Lysine Antitrust Litig.,* 918 F.Supp. 1190 (N.D.Ill.1996). Although an auction procedure has some superficial appeal in its resemblance to a market approach, it was rejected here because the PSLRA sensibly provides that the lead plaintiff, not the court, should play the primary role in selecting lead counsel. *See In re MicroStrategy, Inc. Sec. Litig.,* 110 F.Supp.2d 427, 437–38 (E.D.Va.2000), Notably, the Third Circuit recently held that an auction is, in most cases, an inappropriate method to determine a reasonable fee and select lead counsel in cases brought under the PSLRA. *See Cendant,* 264 F.3d at 273–76.

**22.** The lodestar method was pioneered by the Third Circuit in *Lindy Brothers Builders, Inc. of Philadelphia v. American Radiator & Standard Sanitary Corp.,* 487 F.2d 161, 167–68 (3d Cir.1973). The Fifth Circuit, in *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714 (5th Cir.1974), incorporated a lodestar analysis when it adopted an influential twelve-factor test for arriving at and adjusting a lodestar figure to determine a reasonable award.

**23.** The Fourth Circuit adopted the following factors to be considered in determining a reasonable attorneys' fee in common fund cases:

(1) time and labor expended;
(2) novelty and difficulty of the questions raised;
(3) skill required to properly perform the legal services;
(4) attorney's opportunity costs in pressing the litigation;
(5) customary fee for like work;
(6) attorney's expectations at the outset of litigation;
(7) time limitations imposed by the client or circumstances;
(8) amount in controversy and results obtained;
(9) experience, reputation, and ability of the attorney;
(10) undesirability of the case within the legal community in which the suit arose;
(11) nature and length of the professional relationship between the attorney and client;
(12) fee awards in similar cases.

*Barber v. Kimbrell's, Inc.,* 577 F.2d 216, 226 (4th Cir.1978) (adopting a version of the Fifth Circuit's list of factors in *Johnson v. Georgia Highway Express, Inc.*).

figure. *See Goldberger v. Integrated Res., Inc.,* 209 F.3d 43, 47 (2d Cir.2000). This methodology is less cumbersome to apply than the lodestar computation,[24] and it has the virtue of reducing the incentive for plaintiffs' attorneys to over-litigate or "churn" cases, particularly those cases with a high probability of success.[25] Understandably, the trend in securities class actions and other common fund cases has been toward use of the percentage method.[26] Indeed, in recent years, two circuits have mandated,[27] and seven circuits have explicitly approved,[28] the use of the percentage-of-recovery approach in common fund cases.

 In the end, it is important to recognize that neither method of arriving at a fair and reasonable fee is limited to a mathematical computation yielding a precise result; neither method is simply a matter of arithmetic. Instead, both methods contemplate the exercise of sound judgment by the trial court in adjusting the lodestar figure after a qualitative assessment of various factors or in selecting an appropriate percentage figure after a qualitative assessment of essentially the same factors. In short, arithmetic calculations aid the fee-setting process, but ultimately a trial court's judgment is centrally important and may trump the calculations. It is also important to recognize that in the final analysis, neither the lodestar method nor the percentage method, by itself, is adequate to all circumstances; both are useful tools for trial courts to use to inform and calibrate a judgment as to a fair and reasonable PSLRA fee award. This is so because setting a fair and reasonable fee in the PSLRA context requires meeting three objectives, and neither method, by itself, addresses all three objectives. First, the fee selected must adequately compensate lead counsel for the time expended on the case. The lodestar method ensures this much is accomplished. Second, the fee selected must also, where appropriate, include a reward or enhancement beyond the lodestar figure to account for the difficulty of the case, the degree of success achieved, and other qualitative factors. Again, the lodestar method can accommodate this objective because it includes the use of a trial court's qualitative

---

24. The Third Circuit Task Force on Court Awarded Attorney Fees identified numerous problems with the lodestar method and advocated a return to the percentage method in common fund cases in a report published in 1985. *See Court Awarded Attorney Fees,* Report of the Third Circuit Task Force, 108 F.R.D. 237, 246, 255 (1985).

25. *See* Jonathan R. Macey & Geoffrey P. Miller, *The Plaintiffs' Attorney's Role in Class Action and Derivative Litigation: Economic Analysis and Recommendations for Reform,* 58 U. Chi. L.Rev. 1, 59 (1991).

26. *See Cendant,* 264 F.3d at 220–21. This trend can be attributed, at least in part, to the Supreme Court's comment, in dicta, that "under the 'common fund doctrine,' . . . a reasonable [attorneys'] fee is based on a percentage of the fund bestowed on the class." *Blum v. Stenson,* 465 U.S. 886, 900 n. 16, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984).

27. *See Swedish Hosp. Corp. v. Shalala,* 1 F.3d 1261, 1268–71 (D.C.Cir.1993) (requiring use of the percentage-of-recovery approach); *Camden I Condominium Ass'n v. Dunkle,* 946 F.2d 768, 774 (11th Cir.1991) (same).

28. *See Goldberger,* 209 F.3d at 50 (approving use of the percentage-of-recovery approach); *In re General Motors Corp. Pick–Up Truck Fuel Tank Prods. Liab. Litig.,* 55 F.3d 768, 821–22 (3d Cir.1995) (same); *In re Thirteen Appeals Arising out of the San Juan Dupont Plaza Hotel Fire Litig.,* 56 F.3d 295, 307 (1st Cir. 1995) (same); *In re Washington Pub. Power Supply Sys. Sec. Litig.,* 19 F.3d 1291, 1296 (9th Cir.1994) (same); *Rawlings v. Prudential–Bache Props.,* 9 F.3d 513, 515–17 (6th Cir.1993) (same); *Harman v. Lyphomed, Inc.,* 945 F.2d 969, 974–75 (7th Cir.1991) (same); *Brown v. Phillips Petroleum Co.,* 838 F.2d 451, 454 (10th Cir.1988) (same).

assessment and judgment to adjust the simple product of billable hours and rates.[29] But finally and equally importantly, the process of setting a proper fee in a PSLRA case must include an incentive component to ensure that competent, experienced counsel will be encouraged to undertake the often risky and arduous task of representing a class in a securities fraud case. The percentage method aids in meeting this objective as it is based on the contingent fee concept and PSLRA cases are essentially contingent fee cases; there is no fee unless there is a recovery and the fee awarded must bear a reasonable relation to the size of the recovery. In sum, then, both the lodestar and percentage methods are useful tools for trial courts to use to help calibrate a judgment in selecting a fair and reasonable fee in a PSLRA case. It remains to apply these principles to this case.

■■■■ Lead counsel here report a "lodestar" figure of $10,726,116 [30]—a figure representing approximately 7% of the value of the combined settlements. As with all lodestar figures, it is important to examine its components and assess their reasonableness. The total number of hours reported (37,007) [31] is quite large, but nonetheless reasonable in light of the degree of difficulty involved in prosecuting this complicated case against expert and experienced defense counsel.[32] Similarly, the hourly rates charged by counsel, although high for this locality, are nonetheless within the range of reasonableness for PSLRA cases, where the market for class action attorneys is nationwide and populated by very experienced attorneys with excellent credentials.[33] A review of the tasks undertaken by lead and affiliated counsel as reported in the fee petition reflects what was observed in the briefs and arguments: All issues were thoroughly investigated, comprehensively researched, and ably presented. In sum, this lodestar figure, while high, is within the range of reasonableness for a case of this magnitude and complexity. And, presumably, this lodestar figure, by itself, would adequately compensate lead counsel for the time and effort spent on the case. But to achieve the other objectives of a fair and reasonable fee award under the PSLRA, namely, to reward lead counsel for the favorable result achieved for the class and to provide an incentive for competent lawyers to pursue such actions in the future on an essentially contingent basis, the ultimate award must be substantially greater than the lodestar figure.

■■■■ Lead counsel have requested an aggregate award of attorneys' fees that is

---

29. *See supra* note 23 (listing factors that may be considered).

30. This lodestar figure includes all hours expended on the case by lead counsel and other affiliated plaintiffs' counsel in connection with both settlements.

31. The total hours reported include the hours of attorneys, paralegals, investigators, class correspondents, and computer analysts.

32. In this division virtually all cases, including this one, are placed on an expedited docket. Whether an expedited docket serves to reduce fees and expenses is an empirical question that has not been studied, but there is good reason to believe that providing lawyers with less time for discovery and other litigation activities results in lower fees and costs.

33. The reported hourly rates for lead counsel range from $220/hr. for junior associates to $555/hr. for a senior partner reporting substantial hours in connection with the case. Although these rates are at the high end of reasonableness, the range generally corresponds to the rates charged by the group of experienced securities class action counsel in cases brought in this and other districts. These rates are also not inconsistent with the rates charged by lawyers in large, prominent, and, as here, expert law firms that typically represent defendants in securities class actions.

equivalent to approximately 27% of the combined settlement funds, with a request for 25% of the MicroStrategy settlement and for 30% of the PwC settlement.[34] The current value of the requested fee award is approximately $41 million—$24.6 million from the MicroStrategy settlement[35] and

$16.5 million from the PwC settlement. This is approximately four times the reported lodestar figure. Such an award is more than necessary under the circumstances to achieve the PSLRA's goals and would overcompensate lead counsel at the expense of the class.[36] Instead, it is the

**34.** In support of the request for a higher percentage award from the PwC settlement, lead counsel rely on a declaration by Professor Lucian Bebchuk of Harvard Law School. Prof. Bebchuk argues that a higher percentage is necessary to ensure an appropriate incentive for future lead counsel to seek the largest possible recovery. Put differently, given the proposition that the goal should be to set a fee that, considered *ex ante*, would optimize counsel's incentives to seek the largest recovery, Prof. Bebchuk argues that creating such an incentive requires increasing the percentage fee for the PwC settlement because the PwC settlement was later in time and presumably more difficult to obtain. This argument is simply an application of the principles of declining marginal productivity and increasing marginal cost, which in this context suggest that the cost of obtaining each additional PwC settlement dollar is higher than the cost of securing a MicroStrategy settlement dollar and hence counsel should be awarded a higher percentage of the additional PwC settlement to reflect the higher cost of obtaining that settlement and to provide an adequate incentive to future counsel to seek such an additional or higher recovery.

While Prof. Bebchuk's argument is plausible and not without some intuitive appeal, it founders on a lack of empirical grounding and on the realities of this case. Thus, his argument assumes the typically shaped, continuous, rising marginal cost curve and a declining marginal productivity curve, which may not reflect a more complex reality. For example, Prof. Bebchuk's argument fails to account for the possibility that the marginal cost of obtaining an additional settlement dollar may actually *decrease* at some point as the plaintiff's case is built and the likelihood of success at trial increases. And, an important difference in the nature of the proceeds of the two settlements, as in this case, likely has an effect on lead counsel's incentives. Surely after obtaining a settlement consisting entirely of securities in a volatile, falling market, there remains a strong incentive, independent of the percentage selected for the fee award,

to make a second, all-cash settlement as large as possible.

Finally, Prof. Bebchuk's argument does not and can not address what the proper percentage should be for either settlement; this is ultimately a matter of judgment. And it is the Court's judgment that the percentages selected here provide adequate incremental incentives (lodestar figures already include some incentives that are built in through the hourly rate) for competent counsel to compete to participate as lead counsel in future class action securities cases and seek the highest possible recovery. Indeed, at a recent threshold hearing in this division in a new, unrelated securities class action, there were present among the candidates for lead counsel all the "usual suspects," including lead counsel in this case, even though counsel was well aware of the Court's skepticism concerning Prof. Bebchuk's argument. The fact is, the fees awarded in this and other class action securities cases are already quite ample, and it strains credulity to suggest that an incremental percentage award from the PwC settlement in this case is necessary to encourage the usual suspects and more to compete to litigate these cases and seek the highest possible recovery.

**35.** The value of the MicroStrategy settlement is difficult to assess because it fluctuates with market conditions and the price of MicroStrategy's stock. The MicroStrategy settlement was valued by experts at $98.5 million when the settlement was judicially approved in April 2000. The $24.6 million value of the fee request is based on the April valuation of the settlement. The current value is almost surely lower, but how much lower is uncertain without an additional expert valuation. In any case, lead counsel negotiated a settlement consisting entirely of securities and thus cast their lot with that of the class: They share in any gain or any loss in the value of the settlement.

**36.** An award that is too high may create an incentive to bring less-than-meritorious cases

judgment of the Court that a reasonable fee award in this case is 18% of the recovery from each of the two settlement funds. An 18% fee, which yields a fee award of approximately $27.6 million,[37] is nearly 2.6 times the lodestar figure reported by lead counsel and is ample to serve the three goals of a fair and reasonable PSLRA fee: It compensates lead counsel for their time and effort, rewards them for the result achieved, and provides an adequate incentive for competent counsel to pursue similar cases in the future. The fee shall be awarded from the settlement funds, with the same percentage awarded from each fund. The 18% award from the MicroStrategy settlement fund shall be made in securities from the settlement fund. The 18% award from the PwC settlement fund shall be made from the cash deposited into the fund on October 29, 2001.[38] Distribution of the award to the various participating counsel is the responsibility of lead counsel.[39]

In the end, it is appropriate to note that although the award is less than lead counsel's request, this conclusion is in no way a criticism of the quality and scope of work performed by lead counsel. To the contrary, it is appropriate to note here that lead counsel performed at the highest level, as did counsel for the defendants. The briefs submitted and the arguments made were consistently of the highest quality: comprehensively researched, thoughtfully structured, and ably presented. Both the plaintiff class and the defendants were expertly, energetically, and effectively represented.

on the chance that a victory will provide a large payout for class counsel. *See Swedish Hosp.*, 1 F.3d at 1273 (Ginsburg, J., concurring in part and dissenting in part) ("[R]eliance upon the percentage-of-the-fund approach without any regard for the lodestar may produce excessively high awards and thus encourage even relatively non-meritorious cases to be brought.")

37. The 18% fee from the MicroStrategy settlement is worth approximately $17.7 million, based on the $98.5 million value of the settlement when judicially approved. The 18% fee from the PwC settlement is worth approximately $9.9 million as of October 29, 2001, the date the cash will be deposited into the fund.

38. The fee shall be calculated based on the $55,021,095.88 that would have been deposited in the fund before the deduction for notice costs advanced by PwC. *See supra* note 3.

39. There is one related matter to address with respect to the fee and the negligence of the Milberg Weiss firm in preparing the application of its client, Local 144, to be named lead plaintiff. (See *supra* note 14 for a brief discussion of the erroneous certification that was prepared by Milberg Weiss and submitted in connection with Local 144's application to be named lead plaintiff.) A penalty of $50,000 will be assessed to the fee award of Milberg Weiss for their negligence in misrepresenting the trading losses of co-lead plaintiff Local 144. Although Milberg Weiss performed admirably in the prosecution of this action and demonstrated a high degree of legal skill and tenacity on behalf of the class, the firm would not have been appointed as co-lead counsel if not for the erroneous certification of trading losses that it prepared for its client. The $50,000 penalty will be deducted from the cash portion of the fee award and will remain in the PwC settlement fund for the benefit of the class. The penalty should not be apportioned among lead counsel, but should be applied to Milberg Weiss's portion of the fee award.

Russell Beatie, representing the law firm of Beatie & Osborn, has submitted pleadings alleging other instances of similarly negligent conduct by Milberg Weiss and has urged that Milberg Weiss be denied a fee altogether. The draconian nature of Mr. Beatie's proposed penalty is excessive and unwarranted in the circumstances. No bad faith infected Milberg Weiss's actions, and the penalty assessed is an appropriate sanction for the firm's negligence.

## III.

 The final matter that must be addressed is an award of costs to lead counsel. There is no doubt that costs, if reasonable in nature and amount, may appropriately be reimbursed from the common fund. *See Harris v. Marhoefer*, 24 F.3d 16, 19 (9th Cir.1994) (holding that those costs typically billed by attorneys to paying clients in the marketplace may be reimbursed). Lead counsel here report total costs in connection with both settlements of approximately $2.63 million.[40] The items of costs reported include expenditures for computer legal research, document reproduction, secretarial overtime, court reporting, expert witness and consultant fees, and travel, meals, and lodging, with more than half of the reported costs going to expert witness and consultant fees and expenses. The expenses appear to be reasonable in a case with this level of complexity, and they bear a reasonable relationship to the time and effort expended and the result achieved.

 Lead counsel have requested separate reimbursement of costs with respect to each settlement fund. The request from the MicroStrategy settlement fund includes expenses incurred from the filing of the case to the preliminary judicial approval of the MicroStrategy settlement on January 19, 2001; the request from the PwC settlement fund includes expenses incurred from January 20, 2001 to the hearing on the approval of the PwC settlement held in June 2001. With respect to the MicroStrategy settlement, lead counsel have requested an award of 1.27% of the settlement fund, which was valued at $1.25 million [41] when the settlement was judicially approved. The request is reasonable and will be granted.[42] With respect to the PwC settlement, lead counsel have requested an award of $1,384,019. Lead counsel reported that $1,310,394 of this amount was incurred on or after January 20, 2001, when the Stipulation of Settlement with the MicroStrategy Defendants received preliminary judicial approval. The other $73,626 represents the "overage" of expenses that was not requested in connection with the MicroStrategy settlement, but which, lead counsel contends, was arguably incurred in connection with plaintiffs' claims against all defendants. The request for this "overage" from the MicroStrategy settlement must be denied; to conclude otherwise would violate the representation made to the class in the notice relating to the proposed MicroStra-

---

40. The total expense reimbursement requested by lead counsel does not include $300,000 that PwC placed into an interest-bearing account on June 15, 2001 to pay costs associated with giving notice of the PwC settlement to the class. The judicially approved Stipulation of Settlement provided that the $300,000 plus applicable interest will be deducted from the final settlement payment made by PwC. *See supra* note 3.

41. Lead counsel reported actual expenses of $1,323,626 in connection with the MicroStrategy settlement, which included all expenses through January 19, 2001, the day that the Stipulation of Settlement received preliminary judicial approval. Yet, the request for reimbursement is properly limited to $1.25 million because the notice sent to the class in connection with the proposed settlement listed that amount as the maximum reimbursement for expenses that would be sought by lead counsel.

42. Contrary to the usual practice of requesting actual expenses, lead counsel requested that expenses incurred in connection with the MicroStrategy settlement be awarded as a percentage of the settlement fund, in the proportion that actual expenses bore to the value of the fund at the time of settlement. This unusual request was made because the compensation that lead counsel negotiated for the class consists entirely of securities. Accordingly, expenses in connection with the MicroStrategy settlement are awarded in the amount of 1.27% of the settlement fund.

tegy settlement. A review of the nature and amounts of the remaining costs ($1,310,394) requested in connection with the PwC settlement reveals that the request is reasonable. Accordingly, the request will be granted.[43]

One final matter of expenses remains to be addressed. The law firm of Pomerantz Haudek Block Grossman & Gross LLP ("the Pomerantz firm"), which acted for a time as lead counsel in this suit,[44] has petitioned for reimbursement of expenses incurred in connection with this litigation. The Pomerantz firm participated extensively in the early stages of this litigation and contributed substantially to the drafting of the consolidated complaint during the time they acted as lead counsel. Their withdrawal was not voluntary, but resulted from the withdrawal of the lead plaintiff who had chosen the firm as lead counsel. The Pomerantz firm has requested only an award of expenses and makes no claim for attorneys' fees. The request is reasonable and will be granted. Lead counsel are directed to reimburse the Pomerantz firm $21,725 in expenses.[45]

An appropriate Order has issued.

---

**43.** Lead counsel also requested that interest be included in the award of costs, but calculating and awarding such interest is impractical, if not impossible, given that the various expenses were incurred and paid at different times.

**44.** *See supra* notes 5 and 10.

**45.** Because the early work of the Pomerantz firm benefited the class and all counsel that are receiving awards of fees and expenses, the reimbursement to the Pomerantz firm is to be made by lead counsel from monies already awarded them.