**In re ROYAL AHOLD N.V. SECURITIES AND ERISA LITIGATION.**

No. CIV. 1:03–MD–01539.

United States District Court,
D. Maryland.

Nov. 4, 2003.

Seth D. Goldberg, Seth D. Goldberg PC, Washington, DC, Gregory M. Kline, Adelberg, Rudow, Dorf and Hendler LLC, Baltimore, MD, Andrew J. Entwistle, Robert Nicholas Cappucci, Stephen David Oestreich, Asuncion Cummings Hostin, Johnston deForest Whitman, Jr., Entwistle and Cappucci LLP, New York City, Charles J. Piven, Marshall N. Perkins, Law Offices of Charles J. Piven PA, Baltimore, MD, Samuel Howard Rudman, Robert Michael Rothman, Cauley, Geller, Bowman and Rudman LLP, Melville, NY, Steven J. Toll, Daniel Stephen Sommers, Robert Joseph Barton, Cohen, Milstein, Hausfeld and Toll PLLC, Conor R. Crowley, Finkelstein, Thompson and Loughran, Washington, DC, Robert I. Harwood, Wechsler, Harwood, Halebian and Feffer LLP, New York City, Ronald B. Rubin, Rubin and Rubin Chtd, Rockville, MD, Rob-

ert S. Schachter, Zwerling, Schachter and Zwerling, Lester Levy, Wolf, Popper, Ross, Wolf & Jones, Fred Taylor Isquith, Wolf, Haldenstein, Adler, Freeman and Herz LLP, Marc A. Topaz, Schiffrin and Barroway LLP, Bala Cynwyd, PA, Ralph M. Stone, Lee S. Shalov, Shalov, Stone and Bonner LLP, Steven G. Schulman, Milberg, Weiss, Bershad, Hynes and Lerach LLP, New York City, Steven Donald Silverman, Silverman and Thompson, Baltimore, MD, Menachem E. Lifshitz, Bernstein, Liebhard and Lifshitz LLP, Jonathan Plasse, Goodkind, Labation, Rudoff and Sucharow LLP, New York City, Robert K. Jenner, Janet, Willoughby, Gershon, Getz and Jenner LLC, Baltimore, MD, Christopher Lometti, Frank R. Schirripa, Schoengold and Sporn PC, New York City, for Plaintiff.

Gerard J. Gaeng, David Matthew Wyand, Rosenberg, Martin Funk and Greenberg LLP, Baltimore, MD, John Arak Freedman, Angela Joy Showalter, Leslie Wharton, Scott B. Schreiber, Arnold and Porter, Washington, DC, Douglas P. Baumstein, Glenn M. Kurtz, Joseph B. Schmit, White and Case LLP, New York City, G. Stewart Webb, Jr., Gabrielle S. Moses, Venable, Baetjer and Howard LLP, Baltimore, MD, Max Higgins Lauten, Kramon and Graham, Baltimore, MD, John Curry Millian, Marshall R. King, John T. Behrendt, Lee G. Dunst, Gibson, Dunn and Crutcher LLP, New York City, Staci Jeanne Krupp, Daniel Frank Goldstein, Brown, Goldstein and Levy LLP, Baltimore, MD, for Defendant.

Robert Joseph Barton, Cohen, Milstein, Hausfeld and Toll PLLC, Washington, DC, Charles J. Piven, Marshall N. Perkins, Law Offices of Charles J. Piven PA, Baltimore, MD, Robert N. Kaplan, Kaplan, Fox and Kilsheimer, New York City, Seth C. Berenzweig, Albo and Oblon LLP, John Christopher

Pasierb, Cohen, Gettings and Caulkins PC, Arlington, VA, for Movant.

*MEMORANDUM*

BLAKE, District Judge.

The motions before the court are for the appointment of lead plaintiff in a securities class action, and for approval of the selected lead plaintiff's choice of counsel. The question to be decided is which lead plaintiff movant satisfies the requirements set forth in the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u–4(a)(3).

On February 24, 2003, Koninklijke Ahold N.V. ("Royal Ahold") disclosed to the public that it had overstated its earnings for 2001 and its expected earnings for 2002 by over $500 million.[1] The company also announced that certain transactions in its Argentine Disco unit were legally suspect. As a result of this news, the price of Royal Ahold securities plummeted. The Amsterdam public prosecutor opened a criminal investigation into Royal Ahold's activities after raiding its headquarters, and the U.S. Department of Justice and the SEC began their own investigation after learning that Royal Ahold's subsidiary, U.S. Foodservice, Inc., located in Columbia, Maryland, allegedly used promotional allowances to inflate profit.

Shortly after Royal Ahold's announcement, a number of class action lawsuits were filed in several judicial districts on behalf of purchasers of Royal Ahold securities.[2] The complaints alleged that Royal Ahold violated Sections 10(b) and 20(a) of the Securities and Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), as well as Rule 10b–5, by issuing a series of false and misleading statements concerning its financial condition between early to mid–2001 and February 24, 2003.[3]

1. The amount of announced overstatement has risen dramatically since February 2003. On October 2, 2003, Royal Ahold made a final report of its losses for 2002. Under Dutch accounting standards, Royal Ahold reported a $1.4 billion loss for 2002; under U.S. accounting standards, this may increase to $5.3 billion. Lorraine Mirabella, *Ahold reports big loss for 2002*, Baltimore Sun, October 3, 2003, at 1. The chief financial officer of Royal Ahold attributed the irregularities to incorrect accounting, internal and unin-

tentional misinterpretation of accounting standards, and mischaracterization of receipts. *Id.*

2. Several class actions claiming violations of ERISA also were filed against Royal Ahold. These actions are addressed in a separate Memorandum and Order.

3. On April 24, 2003, a complaint was filed that extended the class period back to March 10, 1998. (Peltz Compl. ¶ 1).

On June 18, 2003, the Judicial Panel on Multidistrict Litigation ("MDL Panel") entered an Order transferring to the District of Maryland twenty-one class action securities and ERISA actions for coordinated or consolidated pretrial proceedings, pursuant to 28 U.S.C. § 1407. Since then, additional related actions also have been transferred here.[4] Briefing resumed on the motions of several groups of plaintiffs to be appointed lead plaintiff, pursuant to the PSLRA. Oral argument was heard on September 26, 2003. For the reasons explained below, the securities fraud actions will be consolidated, and the group consisting of The Public Employees Retirement Association of Colorado and Generic Trading of Philadelphia, LLC ("COPERA/Generic") will be appointed lead plaintiff. Its selection of Entwistle & Cappucci LLP as counsel will be approved.

▆▆▆▆ Preliminarily, the court must address the question of consolidation. The PSLRA requires that if more than one action on behalf of a class asserting substantially the same claim has been filed, and any party seeks to consolidate those actions, the court must decide the question of consolidation before turning to the appointment of a lead plaintiff. 15 U.S.C. 78u–4(a)(3)(B)(ii). The transfer by the MDL Panel was ordered in response to the motions of plaintiffs in eight actions brought in the Eastern District of Virginia to consolidate and coordinate the securities and ERISA actions for pre-trial purposes. At that time, none of the responding parties objected. In deciding whether to consolidate the securities actions, the court must apply Fed.R.Civ.P. 42 and determine whether the risks of prejudice and confusion from consolidation are outweighed by the risk of inconsistent adjudications, the burden on the parties, witnesses, and courts posed by multiple lawsuits, the length of time required to conclude multiple lawsuits, and the relative expense to all concerned. *In re MicroStrategy Sec. Litig.*, 110 F.Supp.2d 427, 431 (E.D.Va.2000) (citing *Arnold v. Eastern Air Lines, Inc.*, 681 F.2d 186, 193 (4th Cir. 1982)). Consolidation is often appropriate in

the case of multiple securities fraud actions that are based on the same public statements and reports. *MicroStrategy*, 110 F.Supp.2d at 431. Differences in class periods, parties, or damages among the suits do not necessarily defeat consolidation, so long as the essential claims and facts alleged in each case are similar. *Id.* In light of these principles, consolidation is appropriate here, where all plaintiffs base their losses on the same overstatements and inflation of profits alleged to have been made by Royal Ahold. Any differences in class period length or damages do not detract from the fact that all the actions involve common factual questions and allegations.

Once the actions are consolidated, the court is instructed by the PSLRA to appoint as lead plaintiff "the member or members of the purported plaintiff class" that the court finds "most capable of adequately representing the interests of class members." 15 U.S.C. § 78u–4(a)(3)(B)(i). The statute creates a rebuttable presumption that the most adequate plaintiff is the person or group of persons that (1) has filed the complaint or made a motion for appointment in response to a notice to class members about the pendency of the suit; (2) has the "largest financial interest in the relief sought by the class"; and (3) otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure. § 78u–4(a)(3)(B)(iii)(I). The presumption may be rebutted by proof from another class member that the presumptively most adequate plaintiff either (1) will not fairly and adequately protect the interests of the class; or (2) is subject to "unique defenses" that make that plaintiff incapable of adequately representing the class. § 78u–4(a)(3)(B)(iii)(II); *see also Koos v. First Nat'l Bank of Peoria*, 496 F.2d 1162, 1164 (7th Cir.1974) (holding that a named plaintiff is not a proper class representative "[w]here it is predictable that a major focus of the litigation will be on an arguable defense unique to the named plaintiff or a small subclass").

At the hearing, the three movants with the most substantial claims to be appointed lead

---

4. On June 23, 2003, and July 24, 2003, I transferred two actions filed separately in the District of Maryland to this MDL action, and on July 25, 2003, the MDL Panel transferred to this district thirteen more actions filed in other districts.

plaintiff were Union Asset Management Holding AG and the General Retirement System of Detroit ("Union" and "Detroit General"); Central States, Southeast and Southwest Areas Pension Fund and SBA Artsenpensioenefondsen ("Central States" and "SBA"); and COPERA/Generic.[5] All of the movants satisfied the requirement of having filed a complaint or filed a timely motion for appointment.

Which proposed lead plaintiff has the largest financial interest is a matter of some disagreement. The PSLRA does not specify how the amount of financial interest involved should be calculated. The Third Circuit has endorsed an approach that directs the court to consider, "among other things: (1) the number of shares that the movant purchased during the putative class period; (2) the total net funds expended by the plaintiffs during the class period; and (3) the approximate losses suffered by the plaintiffs." *In re Cendant Corporation Litigation*, 264 F.3d 201, 262 (3d Cir.2001) (citing *Lax v. First Merch. Acceptance Corp.*, 1997 WL 461036, at *5 (N.D.Ill. Aug.11, 1997)); *see also In re Cable & Wireless, PLC, Sec. Litig.*, 217 F.R.D. 372, 375 (E.D.Va.2003); *In re Enron Corp. Sec. Litig.*, 206 F.R.D. 427, 440 (S.D.Tex.2002); *In re Waste Management, Inc. Sec. Litig.*, 128 F.Supp.2d 401, 409 (S.D.Tex.2000); *In re Nice Systems Sec. Litig.*, 188 F.R.D. 206, 217 (D.N.J.1999); *In re Olsten Corp. Sec. Litig.*, 3 F.Supp.2d 286, 295 (E.D.N.Y.1998). This method of calculation has been called the "Net/Net" approach by the parties in this case. The parties distinguish the "Net/Net" method from the so-called "First–in–First–Out," or "FIFO" method, which is determined by adding the losses incurred from: (1) shares purchased and sold during the class period; (2) shares purchased during the class period and sold during the 90–day look-back period; and (3) shares purchased during the class period and retained after the end of the 90–day look-back period.[6] (Entwistle Decl. 7/28/03 ¶¶ 4–8).

Union initially claims a loss of $44.8 million during the class period of March 6, 2001, through February 24, 2003, to be combined with Detroit General's claimed loss of $1.2 million for the same period, totaling $46 million. (Finberg Decl., Ex. E). Subsequently, in response to allegations that they used the improper Euro–Dollar exchange rate, Union modified its loss calculation using the suggested conversion rate, which resulted in an alleged loss of almost $36 million. (*See* Reply of Union/Detroit General in Support of Mot. to be Appointed Lead Plaintiffs, at 4, Ex. B). Union and Detroit General provided no calculation of their claimed loss for the expanded class period of March 10, 1998, through February 24, 2003, nor did they state which method they used to calculate losses, although it appears to be the Net/Net method. Central States claims a loss of approximately $8 million under the Net/Net method and the FIFO method, while SBA claims a loss of approximately $12 million under the FIFO method but admits it is a "net seller" under the Net/Net calculation. (Mem. of Central States/SBA in Support of Mot. for Appointment as Lead Plaintiff, at 45; Hearing Trans. at 25). This results in a combined loss of $8 million under Net/Net

---

**5.** Lead plaintiff motions also were filed by Baden–Wurttembergische Kapitalanlaegesellschaft mbH and Linda Tsai ("BWK" and "Ms. Tsai"); Itzehoer Aktien Club GbR ("IAC"); the District of Columbia Retirement Board ("D.C.Board"); the City of Philadelphia Board of Pensions & Retirement ("Philadelphia Board"); Brian Kapuscinksi; and David Lasensky. IAC and Ms. Tsai presented arguments on their own behalf at the hearing. (BWK has effectively withdrawn its motion, but it is willing to serve as co-lead plaintiff with Ms. Tsai, should the court find other movants with a greater financial interest inadequate.) The D.C. Board and the Philadelphia Board were present at the hearing, but argued in support of the motion of COPERA/Generic, as did non-movant plaintiffs, the State Retirement and Pension System of Maryland and the office of the Maryland Attorney General. Mr. Kapuscinksi and Mr. Lasensky were not present at the hearing, nor have they submitted any briefs in support of their motions since the transfer of the case to this district. Accordingly, their motions will be treated as withdrawn.

**6.** The PSLRA contains a provision stating that a plaintiff's damages must not exceed the difference between the sale or purchase price of the security at issue and the mean trading price of the security during the 90–day period after dissemination of any information correcting the misstatement or omission that is the basis for the action. 15 U.S.C.A. § 78u–4(e)(1). This period is known as the 90–day "look-back" period.

and $20 million under FIFO. These calculations are based on the class period beginning in March 1998. COPERA/Generic also calculates loss under this expanded class period, providing the following figures: under FIFO, COPERA claims losses of $16.2 million and Generic Trading claims losses of $1.1 million, totaling $17.3 million; under Net/Net, COPERA claims losses of $10.4 million and Generic Trading claims losses of close to $1 million, totaling $11.4 million. (Entwistle Decl. 7/28/03 ¶¶ 8–13). Questions remain concerning Union/Detroit General's use of the shorter class period, whether shares purchased before the class period but sold during the class period should be included in the calculations (*see* Mem. of Central States/SBA in Support of Mot. for Appointment as Lead Plaintiff, at 18), and whether the 90–day "look-back" period should be included in the determination of financial interest. *See MicroStrategy,* 110 F.Supp.2d at 434; 15 U.S.C. 78u–4(e)(1).

If a definitive determination of financial interest were required, the court might well have to request additional documentation, particularly from Union. For reasons to be discussed, however, the lead plaintiff selection will be determined on other factors. For present purposes the court will assume that Union/Detroit General has the largest combined financial interest in the relief sought.

The next issue is whether Union/Detroit General satisfies Rule 23's adequacy and typicality requirements. Initially, this determination is to be made on the basis of the movant's complaint, sworn certification, and other relevant submissions, without considering other movants' objections. *In re David Cavanaugh,* 306 F.3d 726, 730 (9th Cir.2002). The question is whether the movant has "stated a prima facie case of typicality and adequacy." *Cendant,* 264 F.3d at 264. The requirement of typicality is satisfied if the movant's claim arises from the same course of events as those of the other potential class members and relies on similar legal theories to prove the defendants' liability. *See, e.g., Cendant,* 264 F.3d at 265; *MicroStrategy,* 110 F.Supp.2d at 435. Adequacy depends on whether the movant "has the ability to represent the claims of the class vigorously, whether it has obtained adequate counsel, and whether there is a conflict between the movant's claims and those asserted on behalf of the class." *Cendant,* 264 F.3d at 265 (internal quotation marks omitted). In making the adequacy determination the court also should consider: (1)"whether the movant has demonstrated a willingness and ability to select competent class counsel and to negotiate a reasonable retainer agreement with that counsel," and (2) if the movant is a "group of persons," whether that group can function effectively in fulfilling the tasks assigned to the lead plaintiff.[7] *Id.* at 265–66.

Union/Detroit General satisfies the prima facie standard of typicality and adequacy. Its claims are based on the false and misleading statements allegedly made by Royal Ahold, which resulted in the dramatic drop in Royal Ahold stock and the consequent losses to Royal Ahold securities holders. The legal bases for the suit are the federal securities laws, specifically section 10(b) and 20(a) of the Securities and Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a). These are the same events and legal theories that underlie the claims of the rest of the purchasers of Royal Ahold stock, thus making Union/Detroit General's claims typical. Union/Detroit General also satisfies the adequacy requirements of Rule 23. Union is a large sophisticated financial investment institution with the re-

---

7. For purposes of the adequacy determination, the court requested and received *ex parte in camera* submissions from attorneys for the principal movants regarding the fee arrangements they have negotiated with their clients. This information is being considered for the limited purpose enunciated by the Third Circuit:

The question at this stage is not whether the court would 'approve' that movant's choice of counsel or the terms of its retainer agreement or whether another movant may have chosen better lawyers or negotiated a better fee agreement; rather, the question is whether the choices made by the movant with the largest losses are so deficient as to demonstrate that it will not fairly and adequately represent the interests of the class, thus disqualifying it from serving as lead plaintiff at all.

*Cendant,* 264 F.3d at 266; *cf. Cavanaugh,* 306 F.3d at 733–34 (disapproving selection of lead plaintiff based solely on advantageousness of fee agreement).

sources to support a long and complex litigation. Its managed funds contain assets of approximately $95 billion, and it is the third largest institutional investor in Germany. (Union/Detroit General Compl. ¶ 25). Detroit General is a public pension system organized for the benefit of current and retired municipal employees of Detroit, with total assets of approximately $2.9 billion. (*Id.*). There appears to be no reason why they cannot function effectively together as lead plaintiff (indeed all of the three principal movants are comprised of two institutions or organizations). Moreover, they have retained the law firm of Bernstein Litowitz Berger & Grossman LLP, which has substantial experience and success in the field of securities litigation, and the retainer agreement submitted to the court is sufficiently reasonable so as not to disqualify them as lead plaintiff. Accordingly Union/Detroit General is presumptively entitled to appointment as lead plaintiff.

At the next stage, however, the court considers objections raised by competing movants. The statute specifies that the presumption may be rebutted by evidence that the lead plaintiff under consideration (1) will not "fairly and adequately protect the interests of the class," or (2) "is subject to unique defenses that render such plaintiff incapable of adequately representing the class." 15 U.S.C. § 78u–4(a)(3)(B)(iii)(II). Several objections have been raised. Most troubling is the status of Union as a foreign purchaser of Royal Ahold stock on a foreign exchange.[8] Foreign purchasers are subject to a significant jurisdictional defense; there is also an important question about the enforceability of a class action settlement or judgment against foreign members of the class, which may affect the court's Rule 23 determination.

Subject matter jurisdiction in federal securities law fraud cases ordinarily is evaluated on the basis of the "effects" test and the "conduct" test. Under the "effects" test, a court has jurisdiction where illegal activity abroad causes a substantial adverse effect within the United States, either on American investors or on American securities markets. *See Kauthar SDN BHD v. Sternberg,* 149 F.3d 659, 665 (7th Cir.1998); *Robinson v. TCI/US W. Communications Inc.,* 117 F.3d 900, 905 (5th Cir.1997); *Alfadda v. Fenn,* 935 F.2d 475, 478 (2d Cir.1991); *Tri–Star Farms Ltd. v. Marconi,* 225 F.Supp.2d 567, 573 (W.D.Pa.2002) (citing *Robinson*). Under this test, it has not been disputed that the court in this case has jurisdiction over the claims of domestic investors, regardless of where they purchased the securities, and also over the claims of foreign investors who purchased Royal Ahold American Depositary Receipts ("ADR's") on a domestic exchange, because both activities have significant effects in the United States. Jurisdiction over the claims of foreign purchasers of Royal Ahold stock on a foreign exchange, however, depends on the "conduct" test, which examines whether conduct within the United States played a part in the perpetration of securities fraud on investors outside the country. Courts have required somewhat different degrees of activity within the United States to satisfy the conduct test. *Compare Kauthar,* 149 F.3d at 667 (jurisdiction exists "when conduct occurring in the United States directly causes the plaintiff's alleged loss in that the conduct forms a substantial part of the alleged fraud and is material to its success"), *and Bersch v. Drexel Firestone Inc.,* 519 F.2d 974, 993 (2d Cir.1975) (jurisdiction only when conduct within the United States "directly caused" the plaintiff's losses), *with SEC v. Kasser,* 548 F.2d 109, 114 (3d Cir.1977) (jurisdiction "where at least some activity designed to further a fraudulent scheme occurs within this country"), *and Continental Grain (Australia) Pty. Ltd. v. Pacific Oilseeds, Inc.,* 592 F.2d 409, 421 (8th Cir.1979) (jurisdiction when conduct within the United States "was in furtherance of a fraudulent scheme and was significant with respect to its accomplishment"). The Fourth Circuit has not yet stated its own interpretation of the conduct test.

---

**8.** Detroit General, Union's "partner" in the lead plaintiff group, is a domestic purchaser, but its financial interest is relatively small compared to other domestic movants. *See supra* discussion of movants' losses.

Whether subject matter jurisdiction exists under the conduct test for foreign purchasers of Royal Ahold stock on a foreign exchange, such as Union, remains to be determined. There are allegations that U.S. Foodservice used promotional allowances to inflate profit, and the CEO of Royal Ahold appeared to acknowledge on September 4, 2003, that fraud occurred at U.S. Foodservice. (Demonstrative Exhibits of COPERA/Generic in connection with Oral Argument, Tab 1). The allegedly fraudulent statements on which plaintiffs base much of their case, however, were issued by Royal Ahold from the Netherlands, and it is not yet obvious how much of the alleged fraud was carried out or directed from there. In addition, the longer class period of March 10, 1998 to February 24, 2003 encompasses significantly more foreign activity involving Royal Ahold's joint ventures. On March 10, 1998, Royal Ahold issued its Annual Report for 1997, in which it allegedly inflated its sales results, operating results, and earnings for Bompreco, Jeronimo Martins Retail, and Disco Ahold International Holdings, all of which were joint ventures based outside the United States. (Peltz Compl. ¶ 27). These overstatements resulted from the inclusion in Royal Ahold's consolidated financial statements of 100% of the revenues of these joint ventures. (Id.). Indeed, the Dutch criminal investigation of Royal Ahold focuses on its accounting practices related to these joint ventures. (Demonstrative Exhibits of COPERA/Generic in Connection with Oral Argument, Tab 6). Finally, it has been clear from the first announcements of overstatements by Royal Ahold in February 2003 that there may have been illegal activity at Royal Ahold's Argentine Disco Unit. Accordingly, foreign purchasers face serious jurisdictional obstacles to having their claims heard in U.S. courts. It is difficult to see how Union, if appointed lead plaintiff, would be able to avoid devoting a large portion of its time and efforts to proving it is not subject to the unique defense of lack of subject matter jurisdiction. Further, to the extent that an extended class period encompasses alleged activity occurring entirely outside the United States, the presence of a jurisdictional defense would provide Union less incentive to develop these allegations on behalf of the class.

Adding to the concerns about subject matter jurisdiction over Union's claims is the question of the res judicata effect of a judgment in favor of Royal Ahold in this class action. Foreign courts might not recognize or enforce such a decision from an American court, which would allow foreign plaintiffs in the class to file suit against the defendant again in those foreign courts. This factor must be considered in determining whether a class action is the superior method of litigating a particular case, although it is not determinative. *Cromer Finance Ltd. v. Berger*, 205 F.R.D. 113, 134–35 (S.D.N.Y.2001). A strong possibility or near certainty that a foreign court will not recognize a judgment in favor of the defendant as a bar to the action of its own citizens may be the basis for eliminating foreign purchasers from the class. *Bersch*, 519 F.2d at 996. No specific evidence has been produced thus far regarding which foreign courts may or may not recognize a decision of this court. It is possible, however, that Union and other foreign purchasers might be eliminated from the class at the certification stage because a judgment would not be enforceable. *See id.* at 996–97.

The final objection raised to appointing Union/Detroit General as lead plaintiff is the possible existence of a conflict of interest between Union and the rest of the class, which could render it inadequate under Rule 23 or subject it to a unique defense. Until October 2002—thus, for most of the class period—a Dutch bank known as Rabobank was a five percent owner of Union. (Reply of Union/Detroit General in Support of Mot. for Lead Plaintiff Appointment, at 8). Rabobank also was an underwriter of securities for Royal Ahold, and a lender to Royal Ahold, during the class period. (Hearing Trans. at 22). Moreover, Rabobank issued some of its own securities that were convertible into Royal Ahold securities under certain circumstances. (Id. at 23). It is suggested that information possessed by Rabobank about Royal Ahold could have flowed to Union, or more generally that, because of Rabobank's entanglements with Union and its con-

nections to Royal Ahold, Union cannot be completely independent from Rabobank, and thus from Royal Ahold. The suggestion has been made that Rabobank may at some point be a defendant in this case as well. (*Id.*). If all the above allegations are true, according to the other movants, Union would likely not be able to fairly and adequately represent the interests of the class against Royal Ahold, and Union could possess the unique defense of having received non-public information from Royal Ahold.

■■■ In general, courts have not found conflicts of interest where the potential lead plaintiff maintains a financial stake in the defendant corporation, *Cendant,* 264 F.3d at 243–44; *A.F.I.K. Holding SPRL v. Fass,* 216 F.R.D. 567, 575 (D.N.J.2003), nor have they found unique defenses when there is no evidence of any direct contact between the potential lead plaintiff and the defendant's corporate officers. *A.F.I.K. Holding,* 216 F.R.D. at 576; *In re Independent Energy Holdings PLC Sec. Litig.,* 210 F.R.D. 476, 481 (S.D.N.Y.2002). Accordingly, the connections between Union and Rabobank are not alone sufficient to rebut the lead plaintiff presumption and are not given substantial weight in the court's determination.

Union/Detroit General relies heavily upon the decision in *In re Cable & Wireless, PLC, Sec. Litig.,* 217 F.R.D. 372 (E.D.Va.2003), to support its argument for appointment as lead plaintiff. In that case, the court appointed a domestic individual investor, Alex Osinski, along with a foreign institutional investor, the Ontario Teachers' Pension Plan ("OTPP"), as co-lead plaintiffs, finding that because there was a strong argument in favor of subject matter jurisdiction over the foreign investor, it should not be disqualified based on unique defenses. *Id.* at 377. But *Cable & Wireless* is distinguishable from this case in two important ways.

First, the court in *Cable & Wireless* found that, standing alone, Osinski was not an ideal lead plaintiff because he would be unable to represent the interests of the institutional investors in the class. *Id.* at 376. A recognized purpose of the lead plaintiff provision is to involve institutional investors in the prosecution of securities class action suits. *Id.* The one other institutional investor that had moved to be appointed lead plaintiff besides OTPP was a net seller, and thus an atypical and inadequate lead plaintiff. *Id.* at 378. Appointing OTPP as co-lead plaintiff was the only way for an institutional investor to be a lead plaintiff and for the court to ensure that the institutional investors in the class were represented. In this case, all three of the principal lead plaintiff movants are institutional investors, making the only concern *which* institutional investor is most adequate. Second, in *Cable & Wireless* the res judicata effect of any judgment in favor of the defendant was not an issue because the foreign lead plaintiff was based in Ontario, Canada, which recognizes opt-out class actions.[9] *See* Civil Proceedings Act, 1992, R.S.O. S.O.1992, c. 6, s. 9 (Can.) (attached to Entwistle Decl. 7/16/03 Ex. 42).

In light of the above considerations—particularly the possible absence of subject matter jurisdiction over Union's claims and the possibility that foreign courts will not enforce a decision in favor of Royal Ahold against foreign plaintiffs in the class—the court finds that Union/Detroit General's status as presumptive lead plaintiff is rebutted.

■■■ Accordingly, the movant with the next largest financial interest must be considered. I will assume that to be Central States/SBA, even though this is true only under the FIFO method. *See supra* discussion of movants' losses. Like Union/Detroit General, Central States/SBA also establishes a prima facie case for typicality and adequacy. Its claims are based on the same allegedly fraudulent statements by Royal Ahold and are premised on the same legal theories as the other plaintiffs in the class, satisfying the typicality requirement. The adequacy

---

**9.** The recent decision in *In re Nortel Networks Corp. Sec. Litig.,* 2003 WL 22077464 (S.D.N.Y. Sep.8, 2003), involved a similar Canadian institutional investor, Ontario Public Employees' Union Pension Trust Fund ("OPTrust"), seeking certification of a class of domestic and foreign inves-

tors. The court granted the motion for class certification and appointed OPTrust as class representative. *Id.* at *2. Presumably the selection of OPTrust did not cause concerns about the res judicata effect of any judgment.

standard is also met, as the two groups are capable of pursuing this action with vigor and have secured counsel with significant experience in these matters. Central States and SBA are both large, sophisticated institutional investors as contemplated by the PSLRA to prosecute securities fraud actions. The fee agreement negotiated with Milberg Weiss also is sufficiently reasonable to satisfy the adequacy determination. Thus, Central States/SBA is initially entitled to the presumption of lead plaintiff among the remaining movants.

Like Union, however, SBA is subject to the unique defense of lack of subject matter jurisdiction if the activities of Royal Ahold within the United States are not sufficient to satisfy the conduct test. SBA also is subject to the concern that foreign courts will not enforce a judgment in favor of Royal Ahold against foreign plaintiffs in the class. Moreover, under the Net/Net method, SBA is a net seller. Therefore, the presumption of lead plaintiff as to Central States/SBA also is rebutted.

Central States/SBA suggests that to avoid the problems enumerated above, the court should "bifurcate" the action—i.e., appoint separate lead plaintiffs to represent the interests of domestic investors and foreign investors. This approach, however, would entail significant duplication of effort and multiplication of expenses throughout the litigation. As less drastic methods are available to give the foreign investors a voice on the issues of unique concern to them, bifurcation is not appropriate.

With Union/Detroit General and Central States/SBA disqualified, the movant with the next greatest financial interest is COPERA/Generic, with combined losses of $11.4 million under the Net/Net approach and $17.3 million under the FIFO approach. These losses are significant under both calculation methods, and indeed, COPERA/Generic's losses under Net/Net are second only to Union/Detroit General's. Moreover, COPERA/Generic's losses also encompass the

longer class period—from March 10, 1998 to February 24, 2003—which Union/Detroit General did not address. Like the other movants already discussed, COPERA/Generic's claims are typical of the class, as they are based on the same facts and legal theories. COPERA/Generic also satisfies the adequacy requirements. COPERA provides retirement and other benefits to employees of more than 380 government agencies and public entities in Colorado, and has over $28 billion in assets. (Joint Amended Compl. of COPERA/Generic ¶ 9). Generic Trading is one of the largest institutional trading firms in the United States and is a reporting member of the National Association of Securities Dealers and a licensed buyer-dealer in Colorado. (*Id.*). The two together have demonstrated in their submissions thus far that they have the ability and desire to vigorously pursue this litigation. They have retained the firm of Entwistle & Cappucci, which, like counsel for the other movants, has substantial experience in securities class actions. The retainer agreement negotiated with this firm is sufficiently reasonable to satisfy the adequacy requirement.[10] Furthermore, the motion of COPERA/Generic is supported by several domestic plaintiffs which themselves have significant losses. In sum, COPERA/Generic satisfies the requirements of Rule 23 and thus, among the movants remaining, is entitled to the lead plaintiff presumption.

Opposing movants' efforts to rebut the presumption as to COPERA/Generic are not persuasive. It has been suggested that Generic is atypical because it is a day-trader, and day-traders allegedly do not rely on the financial statements or the fundamental value of a company as the rest of the market does. But where false information and misleading omissions pollute the market, all types of investors are injured. *In re Oxford Health Plans, Inc. Sec. Litig.*, 199 F.R.D. 119, 124 (S.D.N.Y.2001) (citing *Leist v. Tamco Enterprises, Inc.*, 1982 U.S. Dist. LEXIS 17389, at *7 (S.D.N.Y., Mar. 16, 1982)). Opposing movants point to no serious concerns that would make COPERA/Generic unable to fairly and adequately represent the interests

---

**10.** The court appreciates the fact that the agreement specifically addresses expenses as well as

percentages of recovery.

of the class, or subject them to unique defenses. Because both COPERA and Generic are domestic investors, they are not subject to the jurisdictional questions that affect Union and SBA. Similarly, there is no question of the res judicata effect of a judgment in favor of Royal Ahold on COPERA and Generic, as domestic plaintiffs. Finally, COPERA/Generic does not suffer from any alleged conflict of interest that would render it incapable of adequately representing the class. The presumption of lead plaintiff in favor of COPERA/Generic is not rebutted, and accordingly, it shall be appointed lead plaintiff in this action. Its choice of counsel will be approved. Entwistle & Cappucci will be appointed lead counsel, with the firm of Adelberg, Rudow, Dorf & Hendler LLC as liaison counsel.[11]

While the court finds COPERA/Generic the "most adequate" lead plaintiff under the PSLRA, it recognizes the legitimate desire of the foreign investors that their arguments concerning subject matter jurisdiction, class certification, and any other unique issues be vigorously represented. Supplemental or independent briefing and the naming of a foreign purchaser as a plaintiff in the Consolidated Amended Complaint are among the methods that may be employed.[12] The court will discuss with counsel the best mechanism to give Union, as the foreign investor with the largest financial interest, an appropriate role in the case.

Accordingly, the motion for appointment as lead plaintiff by COPERA/Generic Trading will be granted, and the motions for appointment as lead plaintiff by all other parties will be denied. A separate order follows.

## SECURITIES CASE MANAGEMENT ORDER NO. 1 (CONCERNING THE APPOINTMENT OF LEAD PLAINTIFF AND COUNSEL)

For the reasons stated in the accompanying Memorandum, it is hereby **ORDERED** that:

1. The securities actions shall be coordinated with the ERISA actions pending before this Court.

2. COPERA/Generic's motion for appointment as lead plaintiff is **Granted;**

3. All other motions for appointment as lead plaintiff are **Denied;**

4. The law firm of Entwistle & Cappucci LLP is appointed lead counsel for the securities actions. Adelberg, Rudow, Dorf & Hendler LLC is appointed liaison counsel for the securities actions.

5. Liaison counsel in the securities actions shall consult with liaison counsel in the ERISA actions and with defense counsel and contact chambers to set a date in November for an initial conference regarding case management and scheduling.

## ERISA CASE MANAGEMENT ORDER NO. 1 (CONCERNING THE APPOINTMENT OF CO-LEAD PLAINTIFFS AND COUNSEL)

WHEREAS, plaintiffs' Michael Lane, James Pattersall Dare, Mark Fraizer, and Peter J. Manhoff own Kononklijke Ahold N.V. (a.k.a. Royal Ahold NV) ("Royal Ahold") stock and securities purchased through their employer retirement benefit plans;

WHEREAS, plaintiffs in the ERISA actions have alleged, among other things, that defendants Royal Ahold, Ahold USA, Inc., R. Henny De Ruiter, Cees Van Der Hoeven, and Michiel Meurs, who are named or deemed to be the fiduciaries of benefit plans maintained for the employees of Royal Ahold and its operating companies in the United States, including Royal Ahold USA, Stop and Shop, Giant Food, U.S. Foodservice, Inc., and Peapod, breached their fiduciary duties to the participants in the employee benefit plans, including those fiduciary duties set

---

11. Because COPERA/Generic has the largest financial interest after Union/Detroit General and Central States/SBA, and its lead plaintiff presumption has not been rebutted, the court need not address the motions of Ms. Tsai and IAC, the two remaining lead plaintiff movants.

12. I do not suggest that COPERA/Generic will ignore or sacrifice the interests of the foreign investors; indeed I expect them to vigorously represent all members of the class.

forth in ERISA § 404, 29 U.S.C. § 1104, and Department of Labor Regulations, 29 C.F.R. 2550;

WHEREAS, the ERISA plaintiffs allege that defendants breached their fiduciary duties to the Plans and the Participants in two principal ways: (a) negligently misrepresenting and negligently failing to disclose material facts to the Plans and the Participants in connection with the management of the Plans' assets and (b) negligently permitting the Plans to purchase and hold Royal Ahold shares when it was imprudent to do so. As a result of these wrongful acts, pursuant to ERISA § 409(a), 29 U.S.C. § 1109(a), it is alleged that defendants are personally liable to make good to the Plans the losses resulting from each such breach of fiduciary duty; and

WHEREAS, numerous securities class action lawsuits have been filed that arise out of the same operative facts as the ERISA actions;

**NOW THEREFORE, IT IS HEREBY ORDERED as follows:**

1. The ERISA actions shall be coordinated with the securities class action pending before this Court.

2. The law firms of Wechsler Harwood LLP and Cauley Geller Bowman Coates & Rudman, LLP are appointed Co–Lead Counsel for the ERISA actions. Rubin & Rubin, Chartered is appointed Liaison Counsel for the ERISA actions.

3. Liaison counsel in the ERISA actions shall consult with liaison counsel in the securities actions and with defense counsel and contact chambers to set a date in November for an initial conference regarding case management and scheduling.

SO ORDERED: